FILED
IN COURT OF CRIMINAL APPEALS
STATE OF OKLAHOMA

JAN 2 6 2015

No. F-2014-573

MICHAEL S. RICHIE
CLERK

IN THE COURT OF CRIMINAL APPEALS FOR THE STATE OF OKLAHOMA

MEGAN NICOLE HAMMERS,                )
                                     )
                    Appellant,       )
                                     )
v.                                   )       Appealed from:
                                     )          District Court Case No. CF-2012-578,
THE STATE OF OKLAHOMA,               )          Oklahoma County
                                     )
                    Appellee.        )

BRIEF OF APPELLANT

RECEIVED

JAN 2 7 2015

ATTORNEY GENERAL

Timothy J. Synar
Oklahoma Bar No. 20862

5030 North May Ave., No. 161
Oklahoma City, OK 73112
(405) 308-9527
timsynar@gmail.com

-and

Mark K. Bailey
Oklahoma Bar No. 19039

4811 Gaillardia Parkway, Ste. 110
Oklahoma City, OK 73142
(405) 607-1177

ATTORNEYS FOR APPELLANT

EXHIBIT
1

TABLE OF CONTENTS

| | PAGE |
|---|---|
| TABLE OF CONTENTS | i |
| TABLE OF AUTHORITIES | i |
| STATEMENT OF THE CASE | 1 |
| STATEMENT OF FACTS | 2 |
| PROPOSITION I | 3 |
| APPELLANT WAS DENIED THE CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF TRIAL COUNSEL | |
| PROPOSITION II | 29 |
| THE TRIAL COURT ERRONEOUSLY DEPRIVED APPELLANT'S RIGHT TO COUNSEL OF HER CHOICE. | |
| CONCLUSION | 32 |

TABLE OF AUTHORITIES
CASE AUTHORITIES

| | |
|---|---|
| Burks v. State, 1979 OK CR 10, 594 P.2d 771 | 24 |
| Cavazos v. Smith, 132 S.Ct. 2, 181 L.Ed.2d 311 (2011) | 9, 12 |
| Collis v. State, 1984 OK CR 80, 685 P.2d 975 | 27 |
| Dunkle v. State, 2006 OK CR 29, 139 P.3d 228 | 27 |
| Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) | 3 |
| Fisher v. Gibson, 282 F.3d 1283 (10th Cir. 2002) | 16, 23 |
| Glossip v. State, 2001 OK CR 21, 29 P.3d 597 | 15 |
| Grant v. State, 2004 OK CR 24, 95 P.3d 178 | 3 |
| Kimmelman v. Morrison, 477 U.S. 365, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986) | 29 |
| Lott v. State, 2004 OK CR 27, 98 P.3d 313 | 3 |

| | |
|---|---|
| Osborn v. Shillinger, 861 F.2d 612 (10th Cir. 1998) | 15, 29 |
| Smith v. State, 2006 OK CR 38, 144 P.3d 159 | 3, 4, 17, 20, 23 |
| Smith v. State, 1982 OK CR 143, 650 P.2d 904 | 17, 22 |
| Stouffer v. Reynolds, 214 F.3d 1231 (10th Cir. 2000) | 29 |
| Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) | 3, 14, 22, 29 |
| United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2nd 342 (1976) | 29 |
| United States v. Cronic, 466 U.S. 658, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984) | 29 |
| United States v. Gonzalez-Lopez, 548 U.S. 140, 126 S.Ct. 2557, 165 L.Ed.2d 409 (2006) | 29 |
| Wampler v. State, 1976 OK CR 179, 553 P.2d 198 | 31 |
| Washington v. State, 1999 OK CR 22, 989 P.2d 960 | 29 |
| Web v. State, COCA Case No. F-2001-985 (August 29, 2002) | 10 |
| Wiley v. State, 2008 OK CR 30, 199 P.3d 877 | 3, 31 |
| Wilhoit v. State, 1991 OK CR 50, 816 P.2d 545 | 22, 28 |
| Williamson v. Ward, 110 F.3d 1508 (10th Cir. 1997) | 28 |
| Wilket v. State, 1984 OK CR 16, 674 P.2d 573 | 24 |

## CONSTITUTIONAL AUTHORITIES

| | |
|---|---|
| US. Const. amend. VI | 3, 29 |
| US Const. amend. XIV | 3, 29 |
| Okla.Const. art., II § 6 | 3, 29 |
| Okla.Const. art., II § 7 | 3, 29 |
| Okla.Const. art., II § 20 | 3, 29 |

IN THE COURT OF CRIMINAL APPEALS FOR THE STATE OF OKLAHOMA

MEGAN NICOLE HAMMERS,                )
                                     )
                Appellant,           )
                                     )
v.                                   )          No. F-2014-573
                                     )
THE STATE OF OKLAHOMA,               )
                                     )
                Appellee.            )

## BRIEF OF APPELLANT

Megan Nicole Hammers was the Defendant in the District Court and will be referred to by name or as Appellant. Appellee will be referred to as the State or the prosecution. Numbers in parenthesis refer to page citations in the original record (O.R.), and transcripts of preliminary hearing (Prel. Hrg. Tr.), trial call-docket hearing (Hrg. Tr.), and jury trial (Trl. Tr.)

## STATEMENT OF THE CASE

Appellant was charged by Information filed on January 27 and September 20, 2012, in Oklahoma County District Court Case No. CF-2012-578, with Child Abuse or Child Neglect in in violation of Title 21, Section 843.5 of the Oklahoma Statutes, allegedly committed on or between December 1 through December 9, 2011. (O.R. 1, 29) Preliminary hearing was held on September 17, 2012, before the Honorable Larry A. Jones, Special Judge, and Appellant was bound over for trial. (Prel. Hrg. Tr., p. 65)

Jury trial was held February 24, 25, 26 and 27, 2014, before the Honorable Donald L. Deason, District Judge. Appellant was represented by Ms. Renee Gish, Attorney at Law, and the State was represented by Gayland Gieger and Emily Harrelson, Assistant District Attorneys. The jury found Appellant guilty of Child Abuse and returned a sentencing verdict of imprisonment for eighteen (18) years. (Trl. Tr., Vol. 4, p. 184); (O.R. 193) On June 20, 2014, the trial court formally sentenced Appellant in accordance with the jury's verdict. (O.R. 238, 282, 291, 293) From this Judgment and Sentence Ms. Hammers now appeals.

STATEMENT OF FACTS

During the week of Thanksgiving 2011, Ms. Hammers' 6 month-old son sustained a significant blow to his head when her 4 year-old son was running through the house and fell on him. (Prel. Hrg. Tr., p. 53; Trl. Tr., Vol. 2, pp. 103, 137, 225-26; Vol. 4, p. 15; Def.'s Ex. 1)  The 4 year-old's knee had struck the infant's head during the fall. (Trl. Tr., Vol. 2, pp. 211-12; Vol. 3, pp. 237-38; Vol. 4, p. 11)  Two weeks later on December 8, 2011, Ms. Hammers took her 6 month-old son to have his eye examined at OU Children's Hospital (OU Children's). (Trl. Tr., Vol. 3, p. 193)  Ms. Hammers noticed her child's left eye had started to "turn-in" on December 3, 2011, after he sustained the impact head trauma from the fall. (Trl. Tr., Vol. 4, p. 92)

Ms. Hammers' child was admitted to OU Children's after a CT scan revealed a subdural hematoma.  While at OU Children's, the child had an MRI that demonstrated additional subdural hematomas.  The child also had a skeletal survey and funduscopic examination that showed various eye and bone injuries. (Trl. Tr., Vol. 2, pp. 271-72, 277-78, 280-81; Vol. 3, pp. 75-79, 85, 96-97)  Ms. Hammers' child was released from OU Children's on December 13, 2011.

Ms. Hammers explained that her child's head and eye injuries could have resulted from the head impact he sustained during the prior fall (See, citations above), and the bone injuries from the use of a doorway baby jumper. (Trl. Tr., Vol. 2, pp. 76-77, 80, 90, 123, 216)  Regardless, the doctors at OU Children's claimed Ms. Hammers' child's head and eye injuries were caused by human shaking, i.e. shaken baby syndrome. (Trl. Tr., Vol. 2, pp. 159, 178, 194, 287; Vol. 3, pp. 107, 158-59)  The doctors also claimed the child's bone injuries were caused by an abusive twisting type of mechanism. (Trl. Tr., Vol. 3, pp. 82, 86-87)

2

PROPOSITION I:   APPELLANT WAS DENIED THE CONSTITUTIONAL RIGHT TO EFFECTIVE
ASSISTANCE OF TRIAL COUNSEL[1]

    Standard of Review. The right to effective assistance of counsel is by far one of the most important of a defendant's constitutional rights.  *See*, U.S.Const. amends. VI, XIV; Okla.Const. art., II §§ 6, 7, 20.  Ineffective assistance of counsel occurs when trial counsel performs in a deficient and unreasonable manner and the defendant is prejudiced thereby. *Wiley v. State*, 2008 OK CR 30, 199 P.3d 877, 878-79 (citation omitted).  Prejudice exists when there is "a reasonable probability that, but for any unprofessional errors by counsel, the result of the proceeding would have been different." *Wiley v. State*, 199 P.3d at 879, citing *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

    Argument.   In several respects, the performance of Ms. Hammers' trial counsel fell below an objective standard of reasonableness and adversely affected her defense.  Counsel's omissions undermined confidence in the outcome of Ms. Hammers' trial, requiring relief.

    1.    Trial counsel prevented Ms. Hammers from making intelligent and knowing decisions regarding her case and counsel's representation.

    "When a lawyer is hired to represent a client in a criminal proceeding, that lawyer does not own the case." *Smith v. State*, 2006 OK CR 38, 144 P.3d 159, 168, citing *Grant v. State*, 2004 OK CR 24, 95 P.3d 178, 182 (Lumpkin, J., special concur).  The lawyer has a "responsibility to advise, inform, and consult with the client." *Lott v. State*, 2004 OK CR 27, 98 P.3d 318, 357, citing *Faretta v. California*, 422 U.S. 806, 819, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975).  The client has "the right [to] be involved in the decision process that will affect his or her life." *Id.*

    That being said, "[a] lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." *Smith v. State*, 144

---

[1]    Pursuant to this Court's Rule 3.11(B)(3)(b), Rules of the Court of Criminal Appeals, Title 22, Ch. 18, App. (2013), Appellant is filing contemporaneously herewith a Motion for Supplementation of the Record and for Evidentiary Hearing on ineffective assistance of trial counsel.

P.3d at 167 (citation omitted) (quoting another source).   "The client should have sufficient information to participate intelligently in decisions concerning the objectives of the representation and the means by which they are to be pursued [.]" *Id.*

Trial counsel entered her appearance in Ms. Hammers' case on June 27, 2012. (O.R. 17) Jury trial and selection commenced more than one and one-half (1 ½) years later on February 24, 2014. (O.R. 281)  Thus, trial counsel had ample time to prepare Ms. Hammers' defense, as well as discuss the same with her prior to trial.

> a.   Trial counsel failed to communicate with Ms. Hammers and prepare her for trial.

Prior to the February 2014 trial, Ms. Hammers' case was scheduled for trial on January, 13, 2014.  (O.R. 281)  E-mails and text messages between Ms. Hammers and trial counsel illustrate Ms. Hammers' concern that counsel was neglecting her case.

For example, Ms. Hammers sent trial counsel the following text message on November 15, 2013: "When will we talk and get together?  U keep postponing I have serious concerns Renee [.]" (3.11 Motion)  Trial counsel responded, in part: "Please bear with me.  We will meet for sure next week." (*Id.*)  The "next week" Ms. Hammers sent trial counsel a text message on November 25. (*Id.*)  Trial counsel responded: "I am out of town for the next two weeks. Please text me your name and next court date to set up an appointment." (*Id.*)

Ms. Hammers waited, and on December 8 she sent a text message to trial counsel stating: "Today marks two years on when my boys were taken.  I hope you are ready to take this to trial!  U have no idea how hard this is on me." (3.11 Motion)  Trial counsel still did not respond, so Ms. Hammers e-mailed counsel on December 11: "Will you please contact me. I have tried getting in touch with you for a few weeks.  I have serious concerns." (*Id.*)

On December 16 Ms. Hammers sent the following e-mail to trial counsel:  "Are you okay?  Trial is in a few weeks and I want it to go and not be delayed again.  I have tried getting ahold of you for a few weeks now and have had no luck.  I need answers." (3.11 Motion)  Ms.

Hammers attempted to contact trial counsel again on December 18. Her e-mail reads: "Hope all is well. Wondering if you are still my attorney. Renee it would be nice to hear from you." (Id.) Trial counsel finally responded that she would start preparing for Ms. Hammers' trial the following week. (Id.)

Roughly two weeks passed, and trial counsel still had not discussed the upcoming trial with Ms. Hammers. On December 30 Ms. Hammers sent trial counsel a text message asking, "What's the plan for trial?" (3.11 Motion) Trial counsel responded, in part, "Don't have time to teach you how to try a case as well as prepare." (Id.) Trial counsel later said, "I will absolutely prep you for everything possible as things come up." (Id.)

Ms. Hammers' trial was rescheduled to February 24, 2014, during the January 10 trial call docket. (O.R. 281) Trial counsel neglected to make arrangements to discuss the trial with Ms. Hammers over the next few weeks. (3.11 Motion) As a result, Ms. Hammers contacted Kent Bridge, Esq., to inquire if Mr. Bridge could represent her at trial. (02/21/14 Hrg. Tr., p. 3); (3.11 Motion) Ms. Hammers spoke with Mr. Bridge "a couple of dozen times" about her concerns regarding trial counsel's representation. (02/21/14 Hrg. Tr., p. 5); (3.11 Motion) Mr. Bridge told Ms. Hammers that he would try her case, as long as he could get the trial continued. (02/21/14 Hrg. Tr., p. 5) Mr. Bridge informed Ms. Hammers that he would contact trial counsel and the State's prosecutor (Id., at p. 4) and appear at the trial call docket on February 21, 2014, to request a continuance on her behalf. (Id., at p. 6)

Trial counsel's level of communication further decreased after Ms. Hammers had talked with Mr. Bridge. (3.11 Motion) Ms. Hammers sent the following text message to Mr. Bridge on February 14:

> Hi Kent, it's Megan Hammers. I was wondering if you have spoke with Renee anymore, because I have not. Stressing a wee bit bc I go before Deason a week from today. If you have any time today to call me will u please. Thank you!

(Id.)  Ms. Hammers called trial counsel later that day, but she did not answer.  (Id.)  Instead, trial counsel responded by text message: "Busy busy day today Megan. What's up?" (Id.)  Ms. Hammers replied, "Just getting worried with court in a week [.]"  (Id.)  Trial counsel did not respond. (Id.)

The parties, along with Mr. Bridge, appeared at the trial call docket on Friday, February 21, 2014. (02/21/14 Hrg. Tr.)  The court denied the request to continue the trial. (Id., at p. 9); (See, Proposition II below)  Thereafter, trial counsel failed to prepare Ms. Hammers and the other defense witnesses for trial.[2] (3.11 Motion)  Ms. Hammers arrived at trial the following Monday without knowing trial counsel's defense plan, or if there was one. (Id.)  Ms. Hammers had also been prevented from reviewing her child's medical records.[3] (See, Sub. 1.b. below)

Here, trial counsel's failure to communicate with Ms. Hammers was due to counsel not having retained experts and understanding the complexities of the case, as demonstrated throughout Proposition I.  Regardless, trial counsel should have ensured that Ms. Hammers received some measure of preparation.  Trial counsel knew before trial that the prosecution intended on introducing statements from Ms. Hammers. (Trl. Tr., Vol. 1, p. 7)  Trial counsel also knew well in advance of trial that Ms. Hammers intended on testifying. (3.11 Motion)  However, trial counsel's lack of communication and assistance prevented Ms. Hammers from competently doing so, thus undermining her right to a fair trial. (See e.g., Subs. 1.b. and 4 below)

---

[2]    Trial counsel's failure to prepare two of the defense witnesses, Ed and Brenda Hammers (i.e., Appellant's parents), was presumably due to the conflict that resulted from counsel's lack of communication with Appellant.  Long before trial, Appellant's parents feared that trial counsel was neglecting their daughter's case and tried to contact counsel to address their concerns. (3.11 Motion)  Trial counsel later warned Appellant that her case would be dropped if Appellant's parents attempted to contact counsel again. (Id.)

[3]    Medical records are key to both the prosecution and defense of a child abuse case, especially when there is no direct evidence of the alleged abuse.  This is one area of the law where medical and scientific evidence (i.e., biomechanics) are used to prove all of elements of the crime.  Ms. Hammers had a certified nurse practitioner, Ginger Woodall, who was willing to review and explain the records to her because trial counsel would not. (3.11 Motion)

      b.    Trial counsel failed to provide Ms. Hammers her child's medical records prior to trial.

Text messages between Ms. Hammers and trial counsel indicate that as early as October 3, 2013, Ms. Hammers asked trial counsel for her child's medical records that counsel received from the State during discovery. (3.11 Motion)

Ms. Hammers sent trial counsel subsequent requests by text message on October 7, 8, and 22, 2013, as well as November 2 and 13, 2013. (3.11 Motion) Trial counsel responded to Ms. Hammers' November 13 request: "Will call asap!! Have your stuff but may need to pop it in the mail." (Id.) Ms. Hammers waited, but she never received the records in the mail. Ms. Hammers sent trial counsel more text messages requesting her child's records on January 10, 11 and 22, 2014. (Id.) Ms. Hammers wrote on January 22: "I need those medical records this week Renee sick of everything waiting until the last minute." (Id.) Ms. Hammers continued her requests less than one month before trial, having sent text messages to trial counsel on January 29, 2014, and February 1 and 3, 2014. (Id.)

Ms. Hammers testified at trial that she never received her child's medical records when he was in the hospital, except for the discharge summary. (Trl. Tr., Vol. 4, pp. 108-109, 123) Ms. Hammers had also not received the records from trial counsel before trial. (See, Trl. Tr., Vol. 4, p. 109 (where Ms. Hammers indicated the first time she saw her child's medical records was during trial)); (3.11 Motion) Trial counsel prevented Ms. Hammers from proceeding to trial with a learned explanation of her child's injuries (See, fn. 3 above), which caused her to be unfairly discredited by the jury.[4]

Trial counsel's level of communication and assistance fell below that required of defense attorneys, hence Ms. Hammers' request for new counsel. (See, Proposition II below)

---

[4]    Trial counsel acknowledged the unfairness that had resulted during her closing argument, stating: "Now let's talk about the medical reports. Did Megan see the medical reports? She saw some of them. Don't take it out on my client that she didn't understand them. Maybe that's my fault. Maybe it's my fault that I didn't go over them with her line by line. Don't hold that against her. She didn't hurt her baby." (Trl. Tr., Vol. 4, p. 163)

2.     Trial counsel was ineffective in failing to retain experts to rebut the State's evidence of shaken baby syndrome.

In the middle part of 2012, Ms. Hammers met with and retained trial counsel.  (3.11 Motion)  During the meeting, trial counsel advised that she would secure experts for Ms. Hammers' case. (Id.) Moreover, trial counsel claimed to have experts in Kansas. (Id.) However, from that point forward trial counsel withheld the fact that she had not secured any experts. (Id.) Evidently, trial counsel still had not told Ms. Hammers three days before trial.  Ms. Hammers sent the following text message to trial counsel on February 21, 2014: "Do we have any expert witnesses?" (Id.)

The State alleged from the inception of this matter that Ms. Hammers' child's head and eye injuries were caused by shaken baby syndrome (SBS).[5]  Trial counsel recognized that SBS is a controversial diagnosis, otherwise counsel would not have told Ms. Hammers early on that experts would be retained.  Assuming *arguendo* that trial counsel did not fully appreciate the need for experts at that time, counsel should have after preliminary hearing.  (See, Prel. Hrg. Tr., pp. 21, 31) (where Dr. Williams indicated SBS is a controversial topic))

Long before Ms. Hammers' trial a myriad of articles in medical and legal periodicals had addressed the controversy surrounding SBS.[6]  For example, it had been heavily documented that the amount of force required for SBS would invariably cause neck trauma.  (See, Sub. 3 below (discussing the lack of neck injury in Ms. Hammers' child)).  Keith Findley[7] noted during a symposium held at Oklahoma City University School of Law in September 2011:

---

[5]     A number of different terms are currently employed to describe SBS, such as shaken impact syndrome (SIS); inflicted childhood neurotrauma; abusive head trauma (AHT); inflicted traumatic brain injury (inflicted TBI); and nonaccidental head injury (NAHI).  Deborah Tuerkheimer, *Science-Dependent Prosecution and the Problem of Epistemic Contingency: A Study of Shaken Baby Syndrome*, 62 Ala. L. Rev. 513, 517 fn. 23 (2011).

[6]     *See, e.g.,* Mark Hansen, *Unsettling Science: Experts Are Still Debating Whether Shaken Baby Syndrome Exists*, A.B.A. J., Dec. 2011; Deborah Tuerkheimer, *The Next Innocence Project: Shaken Baby Syndrome and the Criminal Courts*," 87 Wash. Law Rev 1 (2009); Molly Gena, Comment, *Shaken Baby Syndrome: Medical Uncertainty Casts Doubt on Convictions*, 2007 Wis. L. Rev. 701 (2007).

[7]     Mr. Findley is a Professor of Law at University of Wisconsin Law School.

We also learned a lot from biomechanical engineers who had been studying the thresholds for brain injuries of the type we see here. What they found was that human adults simply cannot shake an infant hard enough to inflict the kinds of head injuries that we see in these cases, but the trauma from impact, even what appears to be relatively minor impact, can do so.  Forces from shaking fall well below established injury thresholds and are one-fiftieth the force of impact.

[...]

So we have this biomechanical evidence that says shaking can't reach those kinds of thresholds. To cause that level of trauma, you'd have to shake a child so hard that you'd inflict massive cervical-spinal injuries; the neck would fail before the brain would suffer the extensive injuries associated with SBS. [8]

It had also been documented that subdural hematomas and retinal hemorrhages are not exclusively diagnostic of SBS.  In fact, Justice Ginsburg noted three years before Ms. Hammers' trial:

By the end of 1998, it had become apparent that "there was inadequate scientific evidence to come to a firm conclusion on most aspects of causation, diagnosis, treatment, or any other matters pertaining to SBS," and that "the commonly held opinion that the finding of [subdural hemorrhage] and [retinal hemorrhage] in an infant was strong evidence of SBS was unsustainable."

*Cavazos v. Smith*, 132 S. Ct. 2, 10, 181 L. Ed. 2d 311, 320 (2011) (Ginsburg, J., dissenting).

With rare exception, SBS prosecutions rest entirely on the testimony of experts.  Here, Ms. Hammers' case was no exception.  There was no direct evidence of Ms. Hammers ever having abused her child.  Thus, trial counsel knew the State's case was dependent on expert opinion.  Taking this into account, as well as the vigorous controversy surrounding SBS, trial counsel should have retained experts to rebut the State's evidence at trial.[9]  *See, Day v. State*,

---

[8]      Keith Findley, et al., Symposium, *Examining Shaken Baby Syndrome Convictions in Light of New Medical Scientific Research*, 37 Okla. City U.L. Rev. 219, 226 (2011) (citations omitted), available at: http://law.okcu.edu/wp-content/uploads/2014/06/OCULREV-Summer-2012-Symposium-219-252.pdf

[9]      Appellate counsel received and reviewed trial counsel's entire case file in preparation of this appeal. (3.11 Motion)  The State's discovery was included in the file, which contained the child's medical record documents. (Id.)  The diagnostic films from the child's x-rays, CT scans and MRI were not included.  (Id.)  If trial counsel failed to procure the diagnostic films, it is likely counsel never attempted to secure any experts for Ms. Hammers' case. A qualified expert would have required a review of the child's medical record documents *and* diagnostic films.

9

2013 OK CR 8, 303 P.3d 291, 296 (where this Court acknowledged the "vigorous" disagreement in authorities on SBS).

This Court has found ineffective assistance of counsel claims valid where attorneys fail to secure experts for trial that would have been helpful in explaining the defendant's theory of the case to a jury. For example, in *Web v. State* the appellant [like Ms. Hammers in the case at bar] claimed that her trial counsel was ineffective "by failing to investigate and present medical evidence to show that the child's injuries could have been caused by means other than shaking [.]" *Web v. State*, COCA Case No. F-2001-985 (August 29, 2002) (unpublished), at 2, attached as Addendum "A". This Court found the appellant's trial counsel ineffective for failing to secure a medical expert. *Id.*, at 4. In doing so, this Court noted in an unpublished opinion:

> While it is true that trial counsel did make an initial attempt to secure a medical expert, when this attempt failed, he did not properly seek a continuance, he made no attempt to get another expert witness to testify or even get an expert to help him understand the medical records. This was particularly important in a case where the most significant part of the State's case against Appellant was the testimony of medical experts.

*Id.*, at 3-4; *see also, Smith v. State*, 2006 OK 38, 144 P.3d 159 (ineffectiveness due to failure to secure expert on issue of battered woman syndrome).

3.  Trial counsel was ineffective in failing to present evidence to rebut the State's evidence of SBS.

The State's doctors testified Ms. Hammers' child presented to OU Children's on December 8, 2011, with the following head and eye injuries: subdural hematomas; in-turning of the left eye, i.e., esotropia; bilateral retinal hemorrhages; vitreous hemorrhage in the left eye; and optic neuropathy. (Trl. Tr., Vol. 2, pp. 271-72, 277-78, 280-81; Vol. 3, pp. 96-97)

Trial counsel failed to rebut the State's doctors' testimony that the child's head and eye injuries could have been caused only by SBS.[10] Even a preliminary review of available authority

---

[10]  *See*, Trl. Tr., Vol. 2, pp. 159, 178 (where Dr. Williams testified that he had only seen subdural hematomas and retinal hemorrhages in shaken baby situations); Vol. 2, p. 194 (where Dr. Williams testified that he did not

show their opinions could be challenged, which contradicts the State's final witness, Dr. Stuemky, who testified:

| | |
|---|---|
| [PROSECUTOR] | So, in 40 years experience in the ER – Are there also medical journals and articles and studies that have been done on all these things that we're talking about? |
| [DOCTOR] | Oh, yeah. Absolutely. I mean that's why it's a specialty. |
| [PROSECUTOR] | From the head injuries to the eye injuries to now the bone injuries? |
| [DOCTOR] | Right. |
| [PROSECUTOR] | And it's just not documented that that happens; is that correct? |
| [DOCTOR] | That is correct. |

(Trl. Tr., Vol. 3, pp. 143-44)

Had trial counsel engaged an expert to advise her on the inaccuracy or accuracy of the prosecution testimony, or reviewed any of the vast amount of authorities on SBS, counsel would have been able to rebut the State's doctors' testimony at trial. Trial counsel did not contest Dr. Stuemky's prejudicially inaccurate claim, leaving the jury to conclude the doctors' opinions were indisputable and Ms. Hammers was guilty.

As illustrated earlier, the shaking forces that are required to cause SBS must be *very* significant. These forces, if present, would invariably cause neck trauma.

> Bandak showed that neck failure, across a spectrum of ages for infants, will occur before brain injury. Barnes more recently used his MRI experience at Stanford to further document the lack of neck findings with alleged shaking and reaffirmed the expectation of neck pathology with a substantial shaking mechanism, including soft

---

know of any accidental mechanism that could have caused Ms. Hammers' child's injuries); Vol. 2, p. 287 (where Dr. Yanovitch testified the child's eye injuries were caused by SBS); Vol. 3, p. 107 (Where Dr. Baird testified the child's subdural hematomas were the result of a shaking); Vol. 3, p. 158-59 (where Dr. Stuemky testified that only violent shaking would have caused the child's subdural hematomas)

tissue injury, ligament injury, fractures and in the extreme, decapitation.[11]

"[W]ithout some findings of neck injury on imaging, intracranial pathology resulting from human shaking of a previously healthy child should be seriously called into question."[12]

Here, Ms. Hammers' child had no identifiable neck injury. Neck trauma is absent in his medical records, including the diagnostic reports from the x-rays, CT scans, and MRI.[13]  (3.11 Motion)  None of the State's witnesses had an expertise in the field of biomechanics (mass, force, velocity, acceleration, etc.).  Yet, the State's doctors posited without challenge that the child's head and eye injuries were caused by SBS, which is contrary to the laws of injury biomechanics.

> [T]he hypothetical mechanism of manually shaking infants in such a way as to cause intracranial injury is based on a misinterpretation of an experiment done for a different purpose, and contrary to the laws of injury biomechanics as they apply specifically to the infant anatomy.

*Cavazos v. Smith*, 132 S. Ct. 2, 10, 181 L. Ed. 2d 311, 320, 2011 (2011), (Ginsburg, J., dissenting); (See also, Sub. 2 above (regarding biomechanical evidence and SBS))

Dr. Williams testified during the prosecutor's direct examination that he did not know the amount of force required to cause SBS.  (Trl. Tr., Vol. 2, p. 157)  Later, trial counsel asked Dr. Stuemky if he could quantify the amount of force, to which he responded:

> I would simply say that it would have taken enough, in terms of a violent shaking, very violent that were any layperson that witnessed it, for you to have been there and witnessed it, you would have been appalled.  You would have. -- Your immediate reaction would be, "Oh my God [.]"

---

[11]  Steven C. Gabaeff, M.D., *Challenging the Pathophysiological Connection between Subdural Hematoma, Retinal Hemorrhage and Shaken Baby Syndrome*, Wes J. Emerg. Med., 12:(2): 144, 146, May 2011 (citations omitted), available at: http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3099599/

[12]  Steven C. Gabaeff, M.D., *supra* fn. 11, at 146.

[13]  A full skeletal survey was performed on Ms. Hammers' child at OU Children's.  According to Dr. Thai's testimony, the skeletal survey included "x-rays of all the bones basically from the top of the head to the toes." (Trl. Tr., Vol. 3, p. 74)

(Trl. Tr., Vol. 3, p. 158)  Dr. Stuemky had undoubtedly inflamed the jury, and trial counsel showed a lack of preparation by not testing the plausibility of his response.[14]   Trial counsel never introduced that Ms. Hammers' child had no injury to his neck.  If SBS could not have caused the child's head and eye injuries, the logical conclusion is the injuries resulted from the accidental impact head trauma he sustained two weeks prior to being seen at OU Children's.  (See, Sub. 4 below)  Had this evidence been communicated to the jury, the outcome of trial likely would have been different.

Trial counsel also failed to challenge the State's ophthalmology expert, Dr. Yanovitch.  Like the doctors who testified about the child's head injury, Dr. Yanovitch testified the child's eye injuries could have been caused only by SBS.  (Trl. Tr., Vol. 2, pp. 286-87)  However, non-abuse causes of increased intracranial pressure (ICP) have long been known to cause all of the child's eye injuries.

> There is a long and well-documented relationship of RH [retinal hemorrhage] to increased ICP unrelated to abuse.  The non-abuse causes of increased ICP leading to RH can be due to [...] post-event cerebral edema [i.e., excess fluid in the brain] from any traumatic or metabolic calamity [.]
>
> [...]
>
> Walsh in 1951 demonstrated the relationship of increase[d] ICP with optic nerve sheath hemorrhage and RH.  The optic nerve sheath is the dura surrounding the optic nerve [.]  Muller in 1974 confirmed that increased ICP caused optic nerve sheath hemorrhage.
>
> [...]
>
> As ICP increases, IOP [intraocular pressure] increases. [...]  In the eye, as pressure and hypoxia increase, capillary wall failure is more likely and the number, size and distribution of RH increase.  [A]s more capillaries fail, especially in the denser and metabolically demanding

---

[14]      Arguably, the State's doctors were not qualified to opine that Ms. Hammers' child's head and eye injuries were caused by SBS.  SBS is a biomechanical concept requiring a biomechanical expert explanation.

areas of the retina, more hemorrhage occurs and blood can coalesce into larger hemorrhages in both the retina and vitreous. [15] [16]

Here, Dr. Williams had testified prior to Dr. Yantovitch that subdural hematomas cause a rise in brain pressure, i.e., increased ICP. (Trl. Tr., Vol. 2, pp. 150-51) Moreover, Dr. Williams had informed trial counsel one and one-half (1 ½) years before trial that it was debatable if SBS caused the child's eye injuries.[17] (Prel. Hrg. Tr., pp. 21, 31) However, trial counsel showed a lack of preparedness and did not attempt to cross-examine Dr. Yanovitch, even after being asked by the prosecutor, "You don't have any questions for her at this point?" (Trl. Tr., Vol. 2, p. 297) Trial counsel responded: "Not really. I mean I could ask questions, but I would just be asking questions." (Id.)

Dr. Baird was presumably the most knowledgeable on increased ICP due to his field of study, neuroradiology. However, trial counsel did not cross-examine Dr. Baird when he later testified. Trial counsel did not address increased ICP as the non-abuse cause of the child's eye injuries. Had trial counsel retained an expert, or listened to Dr. Williams long before trial and investigated the child's eye injuries, counsel would have recognized the significance of increased ICP in relation to Ms. Hammers' defense of accident. That is, short-distance impacts from accidental falls cause subdural hematomas in children. (See, Sub. 4.a. below)

Ineffective cross-examination, particularly of expert witnesses, fails to subject the State's case to an adversarial testing process. Such representation falls below an objective standard of reasonableness and leads to a trial outcome that is unreliable. See, *Strickland v. Washington*, 466 U.S. 688, 687-688, 104 S.Ct. 2052, 2064, 80 L. Ed. 2d 674, 693 (1984); *Glossip v. State*, 2001

---

[15]      Gabaeff, *supra* fn. 11, at 150-52 (citations omitted).

[16]      Increased ICP can also cause estropia, which is a type of strabismus.
*See*, http://pediatrics.med.nyu.edu/conditions-we-treat/conditions/strabismus

[17]      Trial counsel did not cross-examine Dr. Williams at trial about his preliminary hearing testimony, which resulted in the jury never being made aware of the SBS controversy.

OK CR 21, 29 P.3d 597, 599-600 (pervasive ineffective assistance of counsel included lack of meaningful cross-examination and rendered trial outcome reliable).

In addition to the above, trial counsel failed to rebut Dr. Stuemky's testimony that Ms. Hammers' child must have been repeatedly abused because he had acute, subacute, and chronic subdural hematomas. (Trl. Tr., Vol. 3, p. 126) This testimony undoubtedly stirred the jurors' emotions, and the prosecutor latched onto it with fervor. (See e.g., Trl. Tr., Vol. 4, pp. 130, 133, 176) However, the fact that more recent blood was found does not mean the child was abused; he had a chronic subdural hematoma.[18] Chronic subdural hematomas are physically fragile and prone to rebleeding spontaneously and with normal handling.

> CSDH [chronic subdural hematoma] is a common finding on a first CT of a child presenting with ALTE [apparent life threatening event], who may also have acute or subacute SDH [subdural hematoma]. While CSDH may exist without apparent brain damage, it is a bioactive mixture of clotting and declotting factors competing to stabilize and be reabsorbed simultaneously. It is physically fragile and prone to rebleeds with low levels or no apparent force. Rebleeding can occur with a minor trauma, [...] or crying, [...] or with normal handling.
>
> [...]
>
> [I]f a child has a preexisting SDH of any etiology, and chronic SDH has developed, shaking or even normal handling can result in spontaneous rebleeding of the previous SDH (subacute or chronic SDH). Vinchon et al in 2010 found 10% of all SDH cases over a three year period at his institution (16 children total) had spontaneous rebleeds without evidence of abuse. Again the distinction between the previously healthy child and the previously damaged child must be made.[19]

Research and an expert could have helped trial counsel effectively frame cross-examination, had counsel obtained the child's diagnostic films. (See, fn. 9 above); See, Osborn v. Shillinger, 861 F.2d 612, 627, 629 (10th Cir. 1998) (defendant prejudiced by counsel's failure

---

[18] A chronic subdural hematoma is a collection of blood that is at least a week old. (Trl. Tr., Vol. 3, p. 102)

[19] Gabaeff, supra fn. 11, at 149, 153-54 (citations omitted).

to investigate and adequately prepare for trial). Here, the medical record documents do not indicate Ms. Hammers' child had a chronic subdural hematoma. The CT scan report indicates the child had a subacute subdural hematoma. (3.11 Motion) The MRI report reads, "Bilateral subdural hematomas of mixed ages are demonstrated." (Id.) The child's discharge summary classifies the subdural hematomas demonstrated on the CT scan and MRI as subacute. (Id.) Moreover, Dr. Williams testified at preliminary hearing the child's subdural hematomas appeared to be acute. (Prel. Hrg. Tr., pp. 41-42)

In sum, trial counsel repeatedly showed a lack of trial preparation and effective cross-examination. See, Fisher v. Gibson, 282 F.3d 1283, 1294, 1298 (10th Cir. 2002) (ineffectiveness due to failure to prepare and effectively cross-examine). Trial counsel should have made some assurance the jury was made aware that SBS is a diagnosis full of disagreement.

      4.     Trial counsel was ineffective in failing to present evidence in support of Ms. Hammers' defense of accident and rebut the State's evidence.

The defense theory of this case has long been that Ms. Hammers did not physically abuse her child; that the injuries he sustained may have been caused by Ms. Hammers' older son. Ever since the initial DHS inquiry in December 2011, Ms. Hammers had consistently offered the following two explanations of accidental injury:

- Her 6 month-old sustained a significant blow to the head during the week of Thanksgiving 2011, when her 4 year-old son was running through the house and fell on him. (Trl. Tr., Vol. 2, pp. 102, 137, 225-26) The 4 year-old's knee had struck the infant's head during the fall. (Trl. Tr., Vol. 2, pp. 211-12; Vol. 3, pp. 237-38; Vol. 4, p. 11)

- Her 4 year-old son was found on multiple occasions playing rough with her 6 month-old while in a doorway baby jumper, swinging it against the walls and forcing it down to the floor. (Trl. Tr., Vol. 2, pp. 76-77, 90, 123, 216) Her neighbor's children had done this as well. (Trl. Tr., Vol. 2, p. 80)

Yet, trial counsel instructed Ms. Hammers to abandon her defense before having her testify as the last witness at trial. (3.11 Motion) The problem, however, is trial counsel disregarded the

weight of evidence previously brought out at trial that Ms. Hammers had been the child's sole caretaker during the period of time the State's doctors' alleged he was injured.

Ms. Hammers testified as trial counsel instructed (Trl. Tr., Vol. 4, pp. 112-114), which subjected her to much criticism during the prosecutor's cross-examination (Id., at pp. 114-141, 143-146) and discredit before the jury.

Ms. Hammer's testimony was not the product of sound trial strategy. *See, Smith v. State*, 1982 OK CR 143, 650 P.2d 904, 908 (failure of ordinary diligence in pursuing known relevant evidence cannot be deemed mere "strategic error"). It resulted from trial counsel not having retained experts and failing to prepare to meet the State's case and present a defense, which prohibited counsel's ability to effectively cross-examine the State's doctors at trial. Trial counsel's demurer confirms that counsel knew she had not subjected the State's case to a meaningful adversarial testing. (See, Trl. Tr., Vol. 3, p. 172 (where trial counsel stated it was "obvious" child abuse had occurred))

Here, there is a reasonable probability the outcome of Ms. Hammers' trial would have been different if trial counsel pursued her defense of accident. *See, Smith v. State*, 2006 OK CR 38, 144 P.3d 159 (ineffectiveness due to failure to pursue a potentially viable defense).

   a.   Ms. Hammer' child's head and eye injuries could have resulted from the impact head trauma he sustained during his older brother's fall.

Trial counsel not only learned from Dr. Williams at preliminary hearing that SBS was a controversial topic, but also "simple falls" could cause subdural hematomas in infants.

| [COUNSEL] | What about these subdural hematomas that were found on Maddox? |
|---|---|
| [DOCTOR] | Well, again those can happen in a number of different ways. We see them in all kinds of different mechanisms with -- from car accidents to simple falls. |

(Prel. Hrg. Tr., p. 21) Yet, trial counsel did not impeach Dr. Williams when he claimed at trial that falls from kitchen counters and stairs would not cause a subdural hematoma. (Trl. Tr., Vol.

2, pp. 159, 189)  Trial counsel also did not confront Dr. Stuemky's testimony that only falls from "two and three and four stories" could cause a subdural hematoma.  (Trl. Tr., Vol. 3, p. 123) Not once did trial counsel attempt to test the basis for their contentions.  Dr. Stuemky's testimony that there was "no way" Ms. Hammers' child sustained a subdural hematoma when her older son fell on him was not challenged.  (Trl. Tr., Vol. 3, p 145)

Contrary to the doctors' testimony, short-distance falls have been documented to cause subdural hematomas in children.  In fact, short-distance falls have been shown to cause both subdural hematomas and retinal/vitreous hemorrhages.  In a 2001 study, John Plunkett, M.D., reviewed 18 *fatal* short-distance falls that were determined to be accidental.[20]  Thirteen of the eighteen children had subdural hematomas.  While only six of the children had a funduscopic examination documented in their medical records, four of the six sustained bilateral retinal hemorrhages.  A few cases noted in Dr. Plunkett's study follows:

Case 3:  A 17-month old fell five or six feet from a baby carrier type swing, striking her back and head on a grassy surface.  A CT scan indicated a subdural hematoma.

Case 4:  A 20-month old was on the platform of a jungle gym when she fell from the side and struck her head on one of the support posts.  The platform was 67 inches above the ground and 42 inches above the top of the support post that she struck. A CT scan indicated a subdural hematoma.  Funduscopic examination indicated extensive bilateral retinal hemorrhage.

Case 5:  A 23-month old was playing on a plastic gym set. She had climbed the attached latter to the top rail, with her feet 28 inches above the floor.  The child lost her balance and fell headfirst onto a piece of carpet remnant covering the concrete floor.  A CT scan indicated a subdural hematoma.  Funduscopic examination indicated bilateral retinal hemorrhage.

Case 6:  A 26-month old was on a playground swing and fell backward three to six feet, striking his head on hard-packed soil.  A CT scan indicated a subdural hematoma.  Funduscopic examination

---

[20]     John Plunkett, M.D., *Fatal Pediatric Head Injuries Caused by Short-Distance Falls*, Am. J. Forensic Med. Pathol., 22(1): 1-12, 2001, attached to Appellant's 3.11 Motion.

indicated extensive bilateral retinal hemorrhage and vitreous hemorrhage in the left eye.[21]

The opinions offered by Drs. Williams and Stuemky were based on supposition, not science. A qualified defense expert could have disputed their testimony. Based on recent and relevant data, the knee Ms. Hammers' child took to the head when his older brother was running and fell on him could have caused a subdural hematoma. Ms. Hammers' neighbor, Heather Hulsey, testified during preliminary hearing that she noticed the child had a bloody nose and a bruise on the back of his head shortly after Thanksgiving 2011 [after the older brother had fallen on him]. (Prel. Hrg. Tr., p. 53) Dr. Williams testified at trial that he noticed a bruise on the bridge of the child's nose when he later examined the child at OU Children's on December 8, 2011. (Trl. Tr., Vol. 2, pp. 137, 163) The impact from the fall must have been significant, otherwise the child would not have sustained the amount of external trauma[22] that he did (See e.g., Prel. Hrg. Tr., p. 53; Trl. Tr., Vol. 4, p. 15; Def.'s Ex. 1) and continued to exhibit outward signs of the trauma, i.e., bruising, two weeks later at OU Children's.

Moreover, the State's theory of SBS was inconsistent with the child's injuries. Trial counsel should have rebutted the State's evidence with the fact Ms. Hammers' child had no neck injury. The jury could have then logically concluded that the impact from the fall, having occurred two weeks before the child presented to OU Children's, caused the child's chronic subdural hematoma, which continued to hemorrhage. In turn, the increased ICP from the subdural hematomas caused the child's eye injuries.

Research and an expert could have helped trial counsel put the pieces of the SBS puzzle and Ms. Hammers' defense of accident together for the jury to view. Instead, the puzzle was never taken out of the box and Ms. Hammers was deprived of a fair trial. See, Web v. State, COCA Case No. F-2001-985 (August 29, 2002) (unpublished), attached as Addendum "A"

---

[21]    John Plunkett, M.D., supra fn. 20, at 4.

[22]    Dr. Williams testified during preliminary hearing that bruising, swelling, and lacerations are all considered signs of external trauma. (Prel. Hrg. Tr. p. 22)

(counsel ineffective for failing to secure expert to explain defense to jury in SBS case); *see also*, *Smith v. State*, 2006 OK 38, 144 P.3d 159 (ineffectiveness due to failure to secure expert on issue of battered woman syndrome).

> b.    Ms. Hammers' child's bone injuries could have resulted from non-abuse causes.

Theresa Thai, M.D., was the radiologist who read Ms. Hammers' child's bilateral leg x-rays and right wrist x-ray taken at OU Children's on December 9, 2011. (Trl. Tr., Vol. 3, pp. 75, 91) Dr. Thai testified at trial that the x-rays showed two healing bone fractures in each of the child's lower legs, as well as one healed bone fracture in his right wrist. (Id., at pp. 75-79, 85) Dr. Thai also testified the bone fractures were the result of a twisting type mechanism (Id., at pp. 82, 86) which indicated abuse, *absent some type of history that would explain it.* (Id., at p. 87) (emphasis added)

Like SBS, authorities in medical and scientific communities have long criticized the habitual diagnosis of abusive infantile bone injuries without having first ruled out differential diagnoses. It is well-established that unexplained bone fractures in infants are caused by a number of different conditions causing bone fragility, such as rickets. Rickets is caused by a deficiency of vitamin D that results in poor mineralization in the bones.[23]

Vitamin D deficiency is highly prevalent in North America. "A 2010 study of 459 mother-infant pairs in Boston showed that more than half of the infants and approximately one-third of the mothers ... were vitamin D deficient at the time of delivery."[24] Moreover, "[a] 2008 study highlighted several cases where fractures from rickets have been mistaken for child abuse."[25]

---

[23]    *See*, http://www.medicinenet.com/rickets/article.htm.

[24]    Matt Seeley, *Unexplained Fractures in Infants and Child Abuse: The Case for Requiring Bone-Density Testing Before Convicting Caretakers*, 2011 BYU L. Rev. 2321, 2341 (2011) (citation omitted), available at: http://digitalcommons.law.byu.edu/lawreview/vol2011/iss6/13

[25]    Mat Seeley, *supra* fn. 24, at 2341, citing Kathy A. Keller & Patrick D. Barnes, *Rickets vs. Abuse: A National and International Epidemic*, 38 Pediatric Radiology 1210, 1213-14 (2008).

> Pathological fractures may occur [as a result of rickets], as the bones
> are both soft and weak and generally osteopenic when tested.  In
> long bones, the most common rickets-related findings are referred
> to as classic metaphyseal lesions (CML) and are characterized by
> child abuse specialists as abusive injuries.  These 'corner' or 'bucket'
> fractures in most alleged abuse cases are painless, have normal
> range of motion, and no soft tissue injury, making intentional
> application of force unlikely.  The radiographic findings are transient
> [...] but may nevertheless be interpreted as abusive, without clinical
> correlation, vitamin D testing, meaningful differential diagnosis or
> corroborative history of violence.[26]

"Vitamin D levels, alkaline phosphatase, parathyroid hormone (hormone involved in calcium

and phosphate control), and electrolytes, including indirect measurements of kidney function

(BUN and creatinine), should be evaluated if the x-rays show [...] multiple fractures at different

healing stages."[27]

Here, Ms. Hammers' child had multiple metaphyseal fractures at different healing ages.

(Trl. Tr., Vol. 3, pp. 79-80, 82, 84-86, 138-39)  Also, the child's family doctor had not noticed

any bone issues, such as pain, swelling and decreased range of motion, during the routine

well-child exams.  (Id., at pp. 11-12)

> Looking at his records, he appeared to be a fairly healthy child who
> met all of his milestones and really had no issues up until -- or
> throughout most of his well-child checks, with the exception of like
> a pink eye or some basic things like that.

(Id., at p. 12)  In light of this, it is highly unlikely that intentional application of force caused the

child's bone fractures, thus highlighting the need for trial counsel to retain an expert to review

the child's x-ray films and any lab-bloodwork taken at OU Children's.  However, trial counsel

did not have the child's x-ray films (See, fn. 9 above) and lab-bloodwork records.[28]  Moreover,

trial counsel failed to even ask Dr. Thai and the other doctors if lab-bloodwork had been done

---

[26]     Steven C. Gabaeff, M.D., supra fn. 11, at 155 (citations omitted).

[27]     See, http://www.medicinenet.com/rickets/page3.htm.

[28]     As noted in fn. 9 above, appellate counsel received and reviewed trial counsel's entire case file in
preparation for this appeal.  The child's medical records were a part of the State's discovery, which was included
in trial counsel's file.  There were no lab-bloodwork records.  (3.11 Motion)

to rule out various bone disease and disorders.[29]   Clearly, trial counsel's performance deprived Ms. Hammers of a fair trial, a trial whose result is reliable. *See, Wilhoit v. State*, 1991 OK CR 50, 816 P.2d 545, 546-47 (ineffectiveness due to failure of ordinary diligence in pursuing known relevant evidence); *Smith v. State*, 1982 OK CR 143, 650 P.2d 904, 908; *see also, Strickland v. Washington*, 466 U.S. 668, 684, 104 S.Ct. 2052, 2063, 80 L.Ed.2nd 674 (1984).

Notwithstanding the above, trial counsel failed to present evidence in support of Ms. Hammers' explanation that her child's bone injures may have resulted from her older son and neighbor's children playing rough with him while in the doorway baby jumper.   Trial counsel found merit in the explanation, otherwise counsel would not have attempted to ask the DHS social worker, Sharita Williams, early during the trial:

| | |
|---|---|
| [COUNSEL] | Would it surprise you to know that bouncy chairs are one of the leading causes of injuries in children? |
| [PROSECUTOR] | Facts not in evidence. |
| [THE COURT] | That will be sustained. |

(Trl. Tr., Vol. 2, p. 257)   However, trial counsel did not attempt to establish this evidence with another witnesses at trial.   Trial counsel never cross-examined Dr. Thai about the doorway baby jumper.   Moreover, trial counsel failed to challenge Dr. Stuemky when he later testified that it could not have caused the child's bone injuries. (Trl. Tr., Vol. 3, p. 143)

Trial counsel's failure to proceed with Ms. Hammers' possible explanation, after having mentioned it early on, surely created juror disbelief.   But what probably affected the jury more was trial counsel likening the explanation to a "grasping at straws" during her closing argument.

---

29      Lab–bloodwork was addressed with two doctors during the trial.   However, the questions and testimony centered exclusively on the cause of the child's subdural hematomas and whether lab-bloodwork was done to rule out a bleeding disorder. (See, Trl. Tr., Vol. 2, p. 182) (where Dr. Williams testified that he could not recall if bloodwork was done); Id., at p. 183 (where Dr. Williams testified that he was not aware of the child having a blood disorder that would make the child more prone to bleeding); Trl. Tr., Vol. 3, p. 122 (where Dr. Stuemky testified the lab work showed no disease process, etc., that would have caused the child to more easily bleed))

22

(Trl. Tr., Vol. 4, p. 165) *See, Fisher v. Gibson*, 282 F.3d 1283, 1291 (10th Cir. 2002) (effective assistance requires counsel to act "as a meaningful adversary vis-à-vis the state").

The fact is doorway baby jumpers are considered unsafe and known to cause bone injuries. In a recent Consumer Reports' article addressing the issue, the author noted: "The problem with door-frame jumpers is [...] babies can bump into the sides of the door frame, either through vigorous jumping or when someone tries to swing them." [30]  Moreover, the Consumer Product Safety Commission's hospital database has documented cases where children suffered bone injuries [some from twisting] while using baby walkers and jumpers.

04/12/2003:   An 8 month-old child twisted and sprained her lower leg while using a baby walker.

08/20/2003:   A 7 month-old child seemed fine at babysitter's while using a baby jumper.  However, the child was later diagnosed with a fractured tibia (i.e., bone in lower part of leg).

08/07/2006:   A child fractured his lower leg while using a baby jumper.

02/10/2007:   An 8 month-old child's leg got stuck in a baby walker while the babysitter was pulling him out of it.  The child was later diagnosed with a fractured tibia.

04/23/2007:   A 10 month-old child twisted his leg while using a baby walker and sustained a left tibia fracture.

11/04/2007:   An 18 month-old child strained his lower leg when he caught it in a baby jumper.

04/09/2009:   A 6 month-old sprained his lower leg from using a baby jumper.

(3.11 Motion)  Had trial counsel not abandoned this explanation of injury, it is probable that at least one juror could have found reasonable doubt Ms. Hammers did not abuse her child. *See, Smith v. State*, 2006 OK CR 38, 144 P.3d 159 (ineffectiveness due to failure to pursue a potentially viable defense).

---

[30]     *See*, http://www.consumerreports.org/cro/baby-jumpers/buying-guide.htm.

5.    Trial counsel was ineffective in failing to object to the State's presentation of irrelevant, prejudicial and inflammatory evidence.

Prior to trial, the State filed a motion in limine requesting all evidence and testimony regarding Ms. Hammers' relationship with her estranged husband, Matt Bryant, be excluded from the trial. (O.R. 127) The motion alleged the evidence was not relevant to the trial and would cause unfair prejudice and confusion of the issues. (O.R. 128) At the start of trial, the prosecutor informed the court that trial counsel had agreed to the motion.

> [PROSECUTOR]:    [...] We don't have any intention of getting into the relationship between them, the divorce that was going on at the time, the back and forth and all of that. I believe, based on our off-the-record conversation before the Court on Friday, Ms. Gish agreed that all of those other matters would not be relevant in the criminal trial.

(Trl. Tr., Vol. 1, pp. 7-8) The court sustained the motion and Mr. Bryant was called as the State's first witness, during which the parties limited their examinations accordingly.

However, much later during the prosecutor's direct examination of Heather Hulsey, the prosecutor improperly elicited testimony about the "angry" divorce and Ms. Hammers' alleged uneasy and angry disposition. (Trl. Tr., Vol. 2, pp. 61-62) *See*, 12 O.S. § 2404 (evidence of character trait not admissible to prove action in conformity therewith); *Burks v. State*, 1979 OK CR 10, 594 P.2d 771, 772 ("The general rule is that when one is put on trial, one is to be convicted-if at all-by evidence which shows one guilty of the offense charged [.]"); *Wilket v. State*, 1984 OK CR 16, 674 P.2d 573, 576 (while State has limited right to rebut defense evidence of good character, it has no general right to present evidence of bad character).

Trial counsel neither objected to the prosecutor's disregard of the court's earlier evidentiary ruling, nor the prosecutor's improper elicitation of character evidence. Instead, trial counsel cross-examined Ms. Hulsey about Ms. Hammers' non-violent demeanor with her children. (Trl. Tr., Vol. 3, pp. 64-65) The prosecutor then made the following argument to the court:

24

[PROSECUTOR]:    Your Honor, I anticipate, as has been done with this witness, we're going to have a series of witnesses, especially in Defense's case, about character and did you ever have any reason to believe she'd be violent with each other's -- with her children.

[W]hen interviewed, in the police report, they talked to her about if she knew what medication she was taking, this defendant has said that she was on pain pills and Ambien. I brought her PMP and she was taking about 150 pills a month of a generic of hydrocodone as well as the Ambien, probably 30 or 35 a month, I think.

I think it's relevant if we're going to get into "did you ever have any reasons to be concerned" and all that. I told her to stay away from it, so I think that's why she answered the way she answered. But I think the door may have been opened and it's been in the police reports. I want to go there, if I'm allowed.

[THE COURT]:    Care to respond?

[COUNSEL]:    Well, yeah. I specifically stayed away from any substance abuse issues because we've not talked about that throughout the course of this. It wasn't brought up during the investigation by the detectives. It wasn't brought up by DHS. It has been a nonissue.

(Id., at pp. 65-66)

Trial counsel's "objection" was entirely deficient. Trial counsel did not point out the prosecutor was using his violation of the court's evidentiary ruling as a springboard to introduce evidence about Ms. Hammers' use of prescription medication. Trial counsel failed to argue the irrelevancy of such evidence to the State's charges, or the unfair prejudice and confusion that would result if it were allowed. Trial counsel also failed to remind the court of the earlier Jackson-Denno hearings, during which the detectives, who interviewed Ms. Hammers *the day after* she brought her child to OU Children's, testified she did not appear to be under the influence of any drugs or alcohol. (See, Trl. Tr., Vol. 1, pp. 15, 18; Vol. 2, p. 8) In fact, one of the detectives was a drug recognition expert that could "recognize specific categories of drugs somebody may be under the influence of." (Trl. Tr., Vol. 2, p. 74)

25

The court granted the prosecutor's request to develop evidence that Ms. Hammers abused prescription drugs.[31]  Thereafter, trial counsel did not object when the prosecutor introduced into evidence a list of medications that Dr. Bill Buffington had prescribed Ms. Hammers during August 2011 through December 2011.[32]  (Trl. Tr., Vol. 3, p. 167-68; State's Ex. 4)  Not once did the prosecutor elicit testimony that Ms. Hammers abused prescription drugs.[33]  Yet, trial counsel repeatedly failed to object when the prosecutor used the list to infer, as well as inject his own opinion, that Ms. Hammers was addicted to narcotic pain medication.  (See, Trl. Tr., Vol. 3, p. 293 (where prosecutor affirmed Ms. Hammers had a drug problem); Vol. 4, p. 120 (where prosecutor labeled Ms. Hammers a drug addict); Vol. 4, p. 177 (where prosecutor claimed Ms. Hammers had taken narcotic pain medication in excessive amounts); See also, Vol. 3, pp. 217, 274-75, 292-93; Vol. 4, p. 60)

Trial counsel also failed to object when the prosecutor injected hearsay evidence that Dr. Buffington dismissed Ms. Hammers as a patient due to her alleged drug problem.

[PROSECUTOR]:   Dr. Buffington finally had to dismiss you as a patient, because you kept going back to him over and over demanding more drugs.  Now listen to me.  Okay?  He's got patients scheduled today.  Are you going to tell this jury that he did not dismiss you as a patient because of your prescription drug problem?

[MS. HAMMERS]:   No. He dismissed me, yes.

[PROSECUTOR]:   Okay.

---

[31]     Appellant acknowledges that any argument regarding the court's erroneous ruling has likely been waived due to trial counsel's initial failure to object, as well as counsel's repeated failure to do so.

[32]     The following medications are identified on the list:  zolpidem (Ambien) for insomnia; alprazolam (Xanax) for anxiety; hydrocondone-acetaminophen (Lortab) for pain; and oxycodone-acetaminophen (Endocet) for pain. (State's Ex. 4)

[33]     The prosecutor's redirect examination of Ms. Hulsey amounted to nothing more than a recollection of Ms. Hammers having told her about taking pain and sleeping medication.  (See, Trl. Tr., Vol. 3, pp. 67-68)  All of the witnesses that testified during Ms. Hammers' case-in-chief said she showed no signs of prescription drug abuse or addiction. (Trl. Tr., Vol. 3, p. 218, Chelsea Hammers; Vol. 3, p. 242, Ben Hall; Vol. 3, pp. 285-87, Brenda Hammers; Vol. 4, p. 32, Charles Hammers; Vol. 4, pp. 80-85, Appellant)

| | |
|---|---|
| [MS. HAMMERS]: | But not because of that. I disagree with you. |
| [PROSECUTOR]: | Well, he's got 30 people scheduled today that need him. Okay? And your testimony, under oath, is if I bring him down here and make him rearrange all these appointments he's got this afternoon, he's going to say, "No. I dismissed her for another reason?" |

[...]

| | |
|---|---|
| [PROSECUTOR]: | He dismissed you because you kept going to him asking for more drugs, and he says, "I'm not going to give you any more." |
| [MS. HAMMERS]: | I was on a pain management. I went every month. I did a drug test. They monitored me. |

(Trl. Tr., Vol. 4, pp. 116–117; See also, Vol. 4, p. 177 (closing argument))

Here, the outcome of Ms. Hammers' trial was undermined the moment trial counsel failed to properly object to the introduction of evidence regarding Ms. Hammers' use of prescription medication. From that point forward, the trial centered more on Ms. Hammers' character than the State's charges. Without doubt, trial counsel's failure to object to the prosecutor's use of inadmissible evidence played a part in the jury's assessment of Ms. Hammers' guilt. See e.g., Dunkle v. State, 2006 OK CR 29, 139 P.3d 228, 237 (ineffectiveness based in part on improper admission of irrelevant character evidence); Collis v. State, 1984 OK CR 80, 685 P.2d 975, 976-77 (ineffectiveness due to counsel's failure to object to inadmissible hearsay).

6.      Trial counsel was ineffective in failing to call Dr. Buffington as a witness to rebut the State's characterization of Ms. Hammers.

When Ms. Hammers' children were placed in DHS custody in December 2011, Dr. Buffington wrote a letter detailing Ms. Hammers' fitness as a parent.[34]  Ms. Hammers gave the letter to trial counsel long before trial.[35]  (3.11 Motion)  Ms. Hammers had also informed trial

---

[34]      Ms. Hammers and her children had been Dr. Buffington's patients. (Trl. Tr. Vol. 3, pp. 9-12); (3.11 Motion)

[35]      Dr. Buffington's letter was included in trial counsel's case file that appellate counsel received and reviewed in preparation for this appeal. (3.11 Motion)

counsel well in advance of trial that counsel needed to contact Dr. Buffington to discuss the case. (Id.) Roughly one year before trial on April 17, 2013, Ms. Hammers sent trial counsel an e-mail inquiring if counsel would be issuing a trial subpoena to Dr. Buffington. (Id.) Later, the State designated Dr. Buffington as a trial witness. (O.R. 125)

In preparation for this appeal, appellate counsel contacted Dr. Buffington to discuss Ms. Hammers' case. Dr. Buffington attested to the following, by way of affidavit:

- "Ms. Hammers suffered from an appreciable amount of documented pain due to past musculoskeletal injuries. I did not think Ms. Hammers was ever seeking drugs; she had valid injuries."

- "Although Ms. Hammers required a lot of narcotic pain medication, she always stayed within the guidelines that I had established. In my experience, patients being treated for pain management typically build up a tolerance over time to medication and require increased amounts to combat the pain. Throughout the course of treatment, Ms. Hammers never exhibited adverse physical or mental symptoms from the medication."

- "I was not contacted by Ms. Renee Gish, or any attorney representing Ms. Hammers prior to her trial. The only attorneys that I recall ever having contacted me prior [to] Ms. Hammers' trial to discuss [the case] were the district attorneys."

(3.11 Motion)

Here, trial counsel's failure to contact Dr. Buffington prior to trial was unreasonable. Clearly, Dr. Buffington's testimony would have refuted the State's characterization of Ms. Hammers as a drug addict. *See, Wilhoit v. State*, 1991 OK CR 50, 816 P.2d 545, 546 (new trial warranted based on counsel's failure to interview important witnesses and general failure to prepare for trial).

7.    The cumulative effect of trial counsel's ineffective assistance denied Ms. Hammers of a fair trial.

Effective trial counsel must investigate the State's case, as well as possible defense strategies. *See, Williamson v. Ward*, 110 F.3d 1508, 1513-14 (10th Cir. 1997) (adversarial testing thwarted by counsel's failure to investigate and present evidence of defendant's mental illness);

*see also, Kimmelman v. Morrison*, 477 U.S. 365, 374-75, 384, 106 S.Ct. 2574, 2582-83, 2588, 91 L.Ed.2d 305 (1986); *Strickland v. Washington, supra*. Here, trial counsel for Ms. Hammers failed to do so. *See, Osborn v. Shillinger*, 861 F.2d 612, 627, 629 (10th Cir. 1988) (defendant prejudiced by counsel's failure to investigate plausible lines of defense and adequately prepare for trial).

Ms. Hammers was denied her constitutional right to effective assistance of counsel by the failure to subject the State's case to "the crucible of meaningful adversarial testing." *Id.*, at 629; *see also, United States v. Cronic*, 466 U.S. 648, 655-57, 104 S.Ct. 2039, 2044-45, 80 L.Ed.2d 657 (1984). Both the finding of guilt and the sentence of imprisonment for 18 years show the effects of trial counsel's omissions on the jury's decisions. *See, Washington v. State*, 1999 OK CR 22, 989 P.2d 960, 980 (death sentence vacated based on ineffective counsel).

On review of the ineffectiveness of trial counsel, the defendant need not show "the trial would have resulted in a defense verdict, but whether the omitted evidence created a reasonable doubt that did not otherwise exist." *See, Stouffer v. Reynolds*, 214 F.3d 1231, 1234-35 (10th Cir. 2000); *see also, United States v. Agurs*, 427 U.S. 97, 112, 96 S.Ct. 2392, 2402, 49 L.Ed.2nd 342 (1976). This standard is satisfied in Ms. Hammers' case, and her conviction should be reversed. In the alternative, the sentence should be modified.

PROPOSITION II:   THE TRIAL COURT ERRONEOUSLY DEPRIVED APPELLANT'S RIGHT TO COUNSEL OF HER CHOICE.

Standard of Review. A defendant has an absolute constitutional right to retain counsel of her choice and to be represented in the fullest measure by the counsel she believes to be the best. *United States v. Gonzalez-Lopez*, 548 U.S. 140, 146, 126 S.Ct. 2557, 2562, 165 L.Ed.2d 409 (2006); *see also,* U.S.Const. amends. VI, XIV; Okla.Const. art. II, §§ 6, 7, 20. Where the right to be assisted by counsel of one's choice is wrongly denied, it is unnecessary to conduct an ineffectiveness or prejudice inquiry to establish a constitutional violation. *United States v. Gonzalez-Lopez*, 548 U.S. at 148. "Deprivation of the right is complete when the defendant is

erroneously prevented from being represented by the lawyer [s]he wants, regardless of the quality of the representation [s]he received." *Id.*

 Argument. The trial court erred in failing to inquire about the grounds on which Ms. Hammers' request to continue the trial was made before it was denied. Thus, Ms. Hammers was wrongly deprived of the right to be represented by the counsel of her choosing, requiring reversal.

 As demonstrated in Subsection 1 of Proposition I, trial counsel's level of communication and assistance fell below that required of defense attorneys, which led to Ms. Hammers contacting Kent Bridge, Esq., prior to her trial. Mr. Bridge appeared at the trial call docket on February 21, 2014, and informed the court that Ms. Hammers had contacted him three weeks earlier because "[s]he was concerned and was seeking to obtain alternative representation to first-chair this case." (02/21/2014 Hrg. Tr., p. 3) Mr. Bridge indicated that he had since spoken to Ms. Hammers "a couple dozen times" (*Id.*, at p. 5) and explained: "My conversations with Ms. Hammers were that she indicated to me that she would rather I try this case later than Ms. Gish try this case sooner. I don't know any of the details about any of those sorts of circumstances." (*Id.*, at p. 6)

 Mr. Bridge also explained that he was unable to try Ms. Hammers' case the following week because he was scheduled to try a child abuse murder case in Tulsa. (02/21/2014 Hrg. Tr., pp. 4-5) However, Mr. Bridge assured the court that he did not have any intent to delay, and would try Ms. Hammers' case just like he had tried 150 or so others in his career. (*Id.*, at p. 6) Trial counsel then addressed the court and said:

> I would say for the record, Judge, that when I was retained by Ms. Hammers, it was to represent her in her juvenile matters and the termination trial. We had a good working relationship. I kind of slid into the criminal side of it. This is her life, Judge. If she's not comfortable, I'm happy to second-chair this case. I'm happy to stay on this case, but this is her life and if she's not comfortable with me, I'm not going to argue that point. I wouldn't do that. But it's up to the Court what you'd like to do. I don't have anything else to say.

(Id.)

Next, the prosecutor argued that Ms. Gish was an "extremely competent" attorney that had "been involved in criminal cases before." (02/21/2014 Hrg. Tr., p. 7)  The prosecutor also argued, "I haven't heard any legal reason why [Ms. Hammers] would not have an adequate representation at trial." (Id., at p. 8)  Thereafter, the court ruled as follows:

> Okay.  Well, the general tenor of this seems to be some sort of request for continuance, though I note that no motion has been filed.  When I called the case earlier, both sides announced ready. Though Ms. Hammers is not in custody, this is the oldest case on my docket for trial Monday morning. [...] It's my intent to keep this case for trial Monday morning.

(Id., at p. 9)

"Before ruling on a motion for continuance, [a] court must consider the grounds on which the application is made in light of the circumstances of the case." *Wampler v. State*, 1976 OK CR 179, 553 P.2d 198, 201.  Here, the court failed to consider the reasons for the requested continuance.  While no specifics details of trial counsel's ineffectiveness were highlighted for the court, it was sufficiently clear Ms. Hammers had concerns about counsel's representation and had chosen another to represent her.  Had the court simply asked Ms. Hammers, who was present at the hearing, what her concerns were, she might not be serving an 18-year sentence today. (02/21/2014 Hrg. Tr., p. 3)

In *Wiley v. State*, this Court directed trial judges that observed questionable practices by a defense attorney to inform the criminal defendant of their attorney's deficiencies, as well as the right to declare a mistrial. *Wiley v. State*, 2008 OK CR 30, 199 P.3d 877, 880.  Trial judges were specifically instructed "to employ the procedure for holding an *in camera* hearing to determine if the deficiencies noted are part of the trial strategy and, if not, to inform the criminal defendant of the lack of competence of his/her attorney." *Id*.  The basis for this Court's directive was to ensure the protection of that which is most sacrosanct to a criminal defendant, the right to a fair trial.

> Trial judges are vested with unique challenges and responsibilities. They are required to maintain a position of fairness and impartiality throughout the proceedings. This Court is reluctant to place more requirements on the trial judges of this state. However, the right to competent counsel in criminal cases is too important to turn a blind eye when lack of competence is observed in the course of a criminal proceeding.

*Id.*

That being said, if trial judges are compelled to go to the lengths required by this Court in *Wiley v. State*, the trial court in the case at bar was surely obligated to do something far less and simply ask Ms. Hammers why she required new counsel. This should have been done before the trial court denied the request for continuance and with that, Ms. Hammers' right to have the counsel of her choice represent her at trial.

## CONCLUSION

For the reasons and authorities cited herein, Appellant respectfully requests the Judgment and Sentence of the District Court be reversed or, in the alternative, that her sentence by favorably modified.

Respectfully submitted,

MEGAN NICOLE HAMMERS

By: _____

TIMOTHY J. SYNAR
Oklahoma Bar No. 20862

5030 North May Ave. No. 161
Oklahoma City, OK 73107
(405) 308-9527
timsynar@gmail.com

-and

32

MARK K. BAILEY
Oklahoma Bar No. 19039

4811 Gaillardia Parkway, Ste. 110
Oklahoma City, Ok 73142
(405) 607-1177
markbailey.attorneyatlaw@gmail.com

ATTORNEYS FOR APPELLANT

CERTIFICATE OF SERVICE

This is to certify that on this 26 day of January, 2015, a true and correct copy of the foregoing Brief of Appellant was caused to be mailed via United States Postal Service, postage prepaid, to Appellant at the address set out below, and a copy was served upon the Attorney General this date by leaving a copy with the Clerk of the Court of Criminal Appeals for submission to the Attorney General.

TIMOTHY J. SYNAR

MEGAN HAMMERS    #  693220
MABEL BASSETT CORRECTIONAL CENTER
29501 KICKAPOO RD.
MCLOUD, OKLAHOMA  74851

33

ADDENDUM "A"

FILED
IN COURT OF ⸺ ⸺ APPEALS
⸺ OKLAHOMA

AUG 29 2002

## IN THE COURT OF CRIMINAL APPEALS FOR THE STATE OF OKLAHOMA

NANCY S. PARROTT
CLERK

KARYN JO WEBB,　　　　　　　　)
　　　　　　　　　　　　　　　　)
　　　　　　　Appellant,　　　　)　　　NOT FOR PUBLICATION
　　　　　　　　　　　　　　　　)
　　　　-vs-　　　　　　　　　　)　　　No. F-2001-985
　　　　　　　　　　　　　　　　)
STATE OF OKLAHOMA,　　　　　　)
　　　　　　　　　　　　　　　　)
　　　　　　　Appellee.　　　　　)

### S U M M A R Y   O P I N I O N

**STRUBHAR, JUDGE:**

Appellant, Karyn Jo Webb, was tried by a jury in the District Court of Tulsa County and convicted of Injury to a Minor Child in Case No. CF-98-6255. The case was tried before the Honorable Thomas C. Gillert. The jury assessed punishment at fourteen years imprisonment and the trial court sentenced Appellant accordingly. From this Judgment and Sentence Appellant has appealed to this Court.

After thorough consideration of the entire record before us on appeal, including the original record, transcripts, and briefs of the parties, we reverse and remand for a new trial. In reaching our decision, we considered the following propositions of error and determined this result to be required under the law and the evidence:

　　I.　　Ineffective assistance of counsel prevented Appellant from establishing her innocence.

II.   The trial court erred in failing to provide a lesser included instruction.

In her first proposition, Appellant claims she was denied her Sixth Amendment right to the effective assistance of trial counsel. Appellant asserts that defense counsel rendered deficient representation by failing to investigate and present medical evidence to show that the child's injuries could have been caused by means other than shaking, by failing to discover and utilized exculpatory evidence in the available medical records, by failing to conduct meaningful cross examination of the State's medical experts, by failing to discover and utilize Appellant's statement to the police and by failing to find and present character evidence.

"To prevail on a claim of ineffective assistance of counsel, Appellant must overcome the strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance by showing: [1] that trial counsel's performance was deficient; and [2] that he was prejudiced by the deficient performance." *Humphreys v. State,* 947 P.2d 565, 577-78 (Okl.Cr.1997. *See also Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). "To establish prejudice, Appellant must show a reasonable probability that, but for trial counsel's errors, the result of his [trial] would have been different." *Humphreys,* 947 P.2d at 578. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,*

2

466 U.S. at 694, 104 S.Ct. at 2068.   Appellant must demonstrate that counsel's representation was unreasonable under prevailing professional norms and that the challenged action could not be considered sound trial strategy. *Id.* at 688-89, 104 S.Ct. at 2065-66.

To facilitate review of the alleged deficiencies not supported by the trial record, this Court granted Appellant's request for an evidentiary hearing on Sixth Amendment claims pursuant to Rule 3.11(B)(3)(b), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App. (2002).   This hearing was held on April 30, 2002.   Although the district court found that trial counsel was left without a medical expert five days prior to trial, did not request a continuance or make any effort to retain another medical expert, but instead relied upon his own review of the medical records and did not understand the significance of venous sinus thrombosis, and was aware of the existence of various character witnesses but decided not to use them, the district court concluded that Appellant was not denied her Sixth Amendment right to effective assistance of trial counsel.   We disagree.

While it is true that trial counsel did make an initial attempt to secure a medical expert, when this attempt failed, he did not properly seek a continuance, he made no attempt to get another expert witness to testify or even get an expert to help him understand the medical records.   This was

3

particularly important in a case where the most significant part of the State's case against Appellant was the testimony of medical experts. Upon deciding to defend this case without the assistance of a medical expert, trial counsel attempted to show that his client was not the type of person who would harm a child and he did so without utilizing available character witnesses. Trial counsel's performance was in fact deficient, was not sound trial strategy, and prejudiced Appellant. As Appellant was denied her Sixth Amendment right to effective assistance of counsel, this case should be remanded to the district court for a new trial.

As this case requires relief be granted on the issue raised in Proposition I, we decline to address that raised in Proposition II.

### DECISION

The Judgment and Sentence of the trial court is **REVERSED** and **REMANDED** for a **NEW TRIAL.**

4

APPEARANCES AT TRIAL

C. RABON MARTIN
403 S. CHEYENNE
TULSA, OKLAHOMA 74103
ATTORNEY FOR APPELLANT

STEPHEN L. SEWELL
CHAD H. MOODY
406 COURTHOUSE
500 S. DENVER
TULSA, OKLAHOMA 74103
ATTORNEYS FOR THE STATE

APPEARANCES ON APPEAL

ROBERT NIGH, JR.
2617 EAST 21ST STREET
TULSA, OKLAHOMA 74114
ATTORNEY FOR APPELLANT

W.A. DREW EDMONDSON
ATTORNEY GENERAL OF
OKLAHOMA
WENDIE M. COOPER
ASSISTANT ATTORNEY GENERAL
112 STATE CAPITOL BUILDING
OKLAHOMA CITY, OKLAHOMA
73105
ATTORNEYS FOR APPELLEE

**OPINION BY:  STRUBHAR, J.**
LUMPKIN, P.J.:  CONCUR
JOHNSON, V.P.J.:  CONCUR
CHAPEL, J.:  CONCUR
LILE, J.:  CONCUR