**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **MEGAN NICOLE HAMMERS,** | ) |
| | ) |
| **Petitioner,** | ) |
| | ) |
| **v.** | )   **Case No. CIV-16-244-HE** |
| | ) |
| **DEBBIE ALDRIDGE, Warden,** | ) |
| | ) |
| **Respondent.** | ) |

## RESPONSE TO PETITION FOR WRIT OF HABEAS CORPUS

The Attorney General of the State of Oklahoma, E. Scott Pruitt, appearing on behalf of the above-named Respondent, in response to the Petition for Writ of Habeas Corpus on file herein shows the Court as follows:

1.      Megan Nicole Hammers, an inmate in the custody of the State of Oklahoma at the Mabel Bassett Correctional Center, *pro se*, has filed with this Court a petition seeking federal habeas corpus relief.

2.      Petitioner is currently incarcerated pursuant to a judgment and sentence entered in the District Court of Oklahoma County, Case No. CF-2012-578.  Petitioner was tried at jury trial on one count of child abuse or, in the alternative, child neglect.  Petitioner was represented by counsel.  The jury convicted Petitioner of child abuse and recommended a sentence of eighteen (18) years imprisonment (O.R. 193).[1]  The trial court sentenced Petitioner in accordance with the jury's verdict (S.Tr. 7-8; O.R. 238-240).  Petitioner

---

[1]Petitioner rejected a plea offer for a twenty-five (25) year sentence with all but the first fifteen (15) years suspended (Tr. IV 4-5).

appealed to the Oklahoma Court of Criminal Appeals (OCCA) which affirmed her conviction and sentence by Summary Opinion on August 10, 2015 (Briefs and Opinion attached as Exhibits 1-3; Application for Evidentiary Hearing attached as Exhibit 4).

3.      Petitioner did not file an application for post-conviction relief.

4.      Petitioner's petition is timely filed pursuant to 28 U.S.C. § 2244(d)(1).

5.      Petitioner has exhausted her remedies in state court through direct appeal on her habeas grounds 1, 3 & 4. As explained further below in subproposition (C), part of her claims of ineffective assistance of trial counsel in ground 2 are unexhausted as they were never fairly presented to the OCCA on direct appeal.  However, an "anticipatory procedural bar" applies because Petitioner would be procedurally barred under Oklahoma law if she returned to State court to exhaust the claims. *Hain v. Gibson*, 287 F.3d 1224, 1240 (10ᵗʰ Cir. 2002); *Logan v. State*, 293 P.3d 969, 973 (Okla. Crim. App. 2013) (citing Okla. Stat. tit. 22, § 1086). (claims that could have been raised on direct appeal are waived).[2]

6.      No evidentiary hearing is required because Petitioner has failed to show that a factual basis for the claims was not made in state court **and** that the facts underlying the claims would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact finder would have found the applicant guilty of the underlying offenses.  *See Cullen v. Pinholster*, 563 U.S. 170, 184-85 (2011) (holding that evidence introduced in federal court has no bearing on § 2254(d)(1) review, and "[i]f a claim

---

[2]If this Court disagrees with the procedural bar, the State does not affirmatively waive the issue of exhaustion. 28 U.S.C. § 2254(B)(3).

has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court.").

7. The following transcripts are available and have been conventionally filed with the Court under separate cover: Preliminary Hearing transcript, Sept. 17, 2012; Motion Hearing transcript, Feb. 21, 2014; Hearing on appellate counsel transcript, April 4, 2014; Trial transcripts, Vols. I-IV, Feb. 24-27, 2014, Sentencing Hearing transcript, May 29, 2014; Hearing transcript, June 20, 2014; and, Original Record, Oklahoma County Case No. CF-2012-578.[3]  The Respondent is not aware of any proceedings that were recorded but not transcribed.

**STANDARD OF REVIEW**

As this Court is aware, habeas relief is proper only when the state court adjudication of a claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  "Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for

---

[3]The Original Record will be referred to herein as "O.R.".  The preliminary hearing transcript will be referred herein as "P.H. Tr.". The transcripts of the trial will be referred to herein as "Tr."

ordinary error correction through appeal." *Harrington v. Richter*, 562 U.S. 86, 102-03 (2011) (internal citations omitted).  The United States Supreme Court interpreted the § 2254(d) standard in *Williams v. Taylor*, 529 U.S. 362, 413 (2000) and held that:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the State court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

Moreover, application by the state court must be objectively unreasonable. *Id*. at 409. In other words, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." *Id*. at 411.

The Supreme Court has reiterated that before a state prisoner can obtain habeas corpus relief from a federal court he must show:

> [T]hat the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fair minded disagreement.  The reasons for this approach are familiar.  "Federal habeas review of state convictions frustrates both States' sovereign power to punish offenders and their good-faith attempts to honor constitutional rights."

*Richter*, 562 U.S. at 103-104 (internal citations omitted).

4

State court decisions which are not "contrary to" clearly established Supreme Court law can be subjected to federal habeas relief only if they are not merely erroneous, but "an unreasonable application" of clearly established federal law, or based on "an unreasonable determination of the facts." *Early v. Packer*, 537 U.S. 3, 7-8 (2002).  "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'" *Renico v. Lett*, 559 U.S. 766, 773 (2010) (citations omitted).  The Supreme Court emphasized, "AEDPA prevents defendants - and federal courts - from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." *Renico,* 559 U.S. at 779.   The Supreme Court reenforced that emphasis on relying on state court review in *Pinholster*, where the High Court held:

> Section 2254(d) is part of the basic structure of federal habeas jurisdiction, designed to confirm that state courts are the principal forum for asserting constitutional challenges to state convictions.  [T]he state trial on the merits [should be] the main event, so to speak, rather than a tryout on the road for what will later be the determinative federal habeas hearing.

*Id*. at 563 U.S. at 186 (internal citations and quotations omitted).

Finally, there has to be clearly established Supreme Court law with facts that are closely related to those in the case at issue before the federal habeas court need determine whether the state court's holding was "contrary to" or an "unreasonable application" of clearly established federal law.  *House v. Hatch*, 527 F.3d 1010, 1016-1017 (10th Cir. 2008) (citing *Carey v. Musladin*, 549 U.S. 70 (2006)).  "A legal principle is 'clearly established'

within the meaning of this provision only when it is embodied in a holding of [the United States Supreme Court.]" *Thaler v. Haynes*, 559 U.S. 43, 47 (2010).   Clearly established federal law "[i]ncludes only the holdings, as opposed to the dicta, of [the Supreme Court's] decisions." *White v. Woodall*, 572 U.S.___, 134 S. Ct. 1697, 1702 (2014) (internal citations omitted).   The Supreme Court held in *Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (internal citations omitted), "[b]ecause our cases give no clear answer to the question presented, . . . , it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law,'" therefore making habeas relief "unauthorized" under 28 U.S.C. § 2254(d)(1).  Nor has the Petitioner shown that the factual findings of the OCCA were based on an "unreasonable determination of the facts" under § 2254(d)(2).  *Richter*, 562 U.S. at 98. With this standard of review in mind, Petitioner is not entitled to relief and the petition must be dismissed.

## STATEMENT OF FACTS

As the State showed on direct appeal, Petitioner and her husband, Matthew Bryant, were going through a contentious divorce in the Fall of 2011 (Tr. II 33, Tr. III 61-62).  The couple had two children: P.B., who was four at the time; and M.B., who was six-months (Tr. II 32-34).  Petitioner texted Mr. Bryant on December 7, 2011 to say four-year-old P.B. was running through the living room when he fell on six-month-old M.B. and M.B.'s eyes were crossed (Tr. II 34).  Mr. Bryant's last previous contact with his sons was October 19, 2011 (Tr. II 33, 111).  Mr. Bryant was concerned about M.B. and arranged to meet Petitioner the

next morning, Thursday, December 8, 2011, at a McDonald's.  Mr. Bryant saw M.B. in his car seat in Petitioner's car and noticed his eyes were crossed.  He said M.B.'s "nose was pushed in" and was bloody.  The baby was not responsive when his name was called.  It was like "[h]e was not home" (Tr. II 35-36; State's Exhibit 1).

Mr. Bryant accused Petitioner of harming their son, but she said "no, [P.B.] did this" (Tr. II 36).   Mr. Bryant insisted that she take the baby to O.U. Children's Hospital but Petitioner said she had already taken the baby to a pediatrician about his eye.  According to Petitioner, the pediatrician said it was only pink eye.  Mr. Bryant insisted she take the baby to the hospital, and he followed Petitioner to Children's Hospital (Tr. II 36-37).

Dr. Robert Williams, a pediatric emergency medicine physician at O.U. Children's Hospital, treated M.B. when he was brought to the emergency room on December 8, 2011. The baby had a small bruise on his face, and his left eye was turned inward (Tr. II 135-136). Dr. Williams asked Petitioner what might have caused the injury to the baby's eye. Petitioner said some days prior another child fell on top of M.B. (Tr. II 137).  A CAT scan of the baby's brain showed he had subdural hematomas on his brain of differing ages indicating injuries that occurred on different days (Tr. II 155-156).  The hematomas were caused by blood vessels in the brain being torn and bleeding.  In Dr. Williams' experience this type of injury in a baby is caused by "[a] rapid acceleration and deceleration event."  In his experience, other than in a car accident, it is caused most commonly by violently shaking the baby (Tr. II 157-159).  The doctor was not aware of any accidental mechanism, other than being in a car wreck, that would cause that type of injury (Tr. II 160).  In Dr. Williams'

7

opinion, the subdural hematomas suffered by the baby were not caused by a four-year-old tripping and falling on the baby's head (Tr. II 193).  An X-ray of the baby's body revealed multiple fractures of varying ages (Tr. II 161-162).

Dr. Tammy Yanovitch, a pediatric ophthalmologist, examined the baby on December 8, 2011, in an attempt to diagnose his crossed left eye (Tr. II 271).  The baby's left pupil was not reacting to light, and he had bleeding in both eyes.  The baby had retinal hemorrhages in both eyes (Tr. II 274, 277).  The baby also suffered optic neuropathy, or injury to the optic nerve, in both eyes but it was worse in the left eye (Tr. II 280-281).  Dr. Yanovitch ruled out causes for the injuries other than trauma.  In her opinion the injuries to the eyes were caused by "acceleration/deceleration forces" consistent with abuse.  She was not aware of any accidental mechanism that could cause such injuries (Tr. II 283-287).  The injuries to the baby's eyes were not consistent with a four-year-old tripping and falling on the baby's head (Tr. II 295).  In Dr. Yanovitch's opinion the baby's left eye turned inward within hours of the injury that caused it (Tr. II 292).  Tragically, at the time of trial over two years later, the child was blind in his left eye (Tr. II 290).

Dr. Theresa Thai, a board certified diagnostic radiologist, examined the X-rays taken of M.B. at Children's Hospital.  The baby had two healing fractures in both legs.  In her opinion, the fractures were consistent with "a twisting kind of injury" rather than a fall or a direct blow (Tr. III 75-76).  Three of the fractures to the baby's legs appeared to be more than a week old at the time he was brought to the hospital and one fracture was closer to a week

old (Tr. III 79).  The fractures were not consistent with another child falling on the baby (Tr. III 82-83).

The baby also had two fractures to his right wrist which were also consistent with a twisting force and not with a fall.  The fractures to his wrist were close to a month old (Tr. III 85-87).

Dr. Sam Baird, a radiologist, examined the result of the CAT scan of M.B.'s skull. It revealed no skull fracture, but the baby had subdural hematomas and some "brain volume loss."  The brain volume loss could be caused by malnutrition or chronic illness.  It could also be caused by child abuse where the brain is shaken.  Dr. Baird suspected non-accidental trauma as the cause of the brain volume loss when coupled with the evidence of the subdural hematomas (Tr. III 96-98).

Dr. Baird also examined an MRI of the baby's head.  The subdural hemorrhages on the baby's brain ranged from white to shades of gray on the MRI images, indicating different ages or times when the baby suffered the injuries causing  hemorrhages (Tr. III 102-103). Dr. Baird could not think of an accidental explanation for the subdural hemorrhages occurring at different times (Tr. III 104).  The MRI also showed no signs of external injuries to the baby's skin or scalp which led Dr. Baird to believe the subdural hemorrhages were caused by shaking (Tr. III 106-107).

Dr. John Stuemky, a pediatric physician at O.U. Children's Hospital, examined M.B. at the hospital (Tr. III 117).  The baby had bilateral subdural hematomas.  In Dr. Stuemky's experience, in the absence of a motor vehicle accident, the injuries were consistent with

physical abuse (Tr. III 118).  The baby's blood was tested and there were no defects or blood disorders that could account for the subdural hematomas the baby suffered (Tr. III 119-122). The varying ages of the subdural hematomas indicated repeated episodes of trauma severe enough to cause bleeding in the brain.  In Dr. Stuemky's experience, this was consistent with non-accidental trauma (Tr. III 125-126).  The injuries were not consistent with a four-year-old falling on the baby (Tr. III 145).  Nor could a four-year-old cause the twisting motion with sufficient force to cause the fractures to the baby's legs and wrist (Tr. III 143).  The leg fractures were also inconsistent with being caused by excessive bouncing in a bouncy swing because of the twisting nature of the fractures (Tr. III 142-144).

Sharita Williams, a child welfare specialist with the Department of Human Services, talked to Petitioner at the hospital to see if she knew what happened to cause M.B.'s injuries. Petitioner said she did not know what happened to M.B.  She said she had been the only caretaker for the child during the Thanksgiving holiday, up until the time he was admitted to the hospital on December 8.  Petitioner said that around Thanksgiving the four-year-old brother of M.B. fell on the baby, and his leg hit the baby's head (Tr. II 211-212, 258).

When Ms. Williams asked Petitioner about the fractures to the baby's legs, Petitioner said she had a bouncy swing that hung in the doorway of her apartment and that the older brother got on it with M.B. and played rough with him.  She said the older brother pulled the swing down to the floor with the baby in it, and let it bounce  (Tr. II 216-217).

Detective Misty Spence of the Edmond Police Department talked to Petitioner at the hospital to see if Petitioner had any idea how the baby's injuries occurred.  Petitioner said

that around Thanksgiving she was changing the baby's diaper on the floor at her boyfriend's house when his four-year-old brother tripped and fell on the baby (Tr. II 102). Petitioner said she noticed the baby's eye turn inward on December 3, 2011. Petitioner said she took the baby to see Dr. Buffington on December 4, 2011, about the eye but the doctor told her it was lazy eye. Petitioner said she took the baby to the emergency room on December 8 because the eye was not getting better, and her husband saw the eye and told her to take the baby to the hospital (Tr. II 104-105).

Detective David Otwell of the Edmond Police Department interviewed Petitioner on December 9, 2011. Petitioner voluntarily came to the police station at Detective Otwell's request. She was not under arrest, but she was read her *Miranda*[4] rights and agreed to talk to the police (Tr. II 65-73).

Petitioner explained that she believed the fractures in the baby's legs were caused by the older brother bouncing him up and down in his bouncy seat into the floor in a rough manner (Tr. II 76-77). She said the injuries to the baby's head and eyes could have been caused by the older brother tripping and falling on the baby when she was changing the baby's diaper on the floor (Tr. II 78-80). Petitioner also said the neighbor's kids would come over and play rough with the baby in his bouncy seat. She supplied no other information as to how she thought the injuries were caused (Tr. II 80). She did not attempt to blame her neighbor.

---

[4]*Miranda v. Arizona*, 384 U.S. 436 (1966).

Petitioner took M.B. to Dr. Buffington's after hours clinic on Sunday, December 4, 2011, about his inward turned left eye.  She saw Dr. Buffington's physician assistant Caylon Haggard (Tr. III 11, 25).  P.A. Haggard noticed the baby's left eye was turned inward (Tr. III 26; State's Exhibit 1).  P.A. Haggard was immediately concerned.  Petitioner said the older brother had jumped on the baby about a week earlier and, at some point shortly after, she noticed his left eye was turned inward.  She said she brought the baby to see P.A. Haggard about a week later (Tr. III 26-27).

P.A. Haggard felt the child's eye condition was serious enough that it needed to be dealt with that day.  It was so serious that he called Dr. Buffington to see if he thought the child should be transported to the hospital by ambulance (Tr. III 29).  It was decided after consulting with Dr. Buffington that Petitioner could transport the baby to the emergency room.  P.A. Haggard explained to Petitioner the need to take the child to the emergency room.  He said he discussed that and communicated it very clearly to Petitioner, and she agreed to take the baby to the emergency room (Tr. III 31-33).  However, it was not until four days later, after the baby's father insisted, that Petitioner actually took the baby to the emergency room (Tr. II 36-37).

Petitioner presented the testimony of her sister, boyfriend, mother and father to say she was a good mother, that they had never seen her abuse her children and they did not believe that she would (Tr. III 175-196, 220-242, 277-287, Tr. IV 9-36).  Petitioner testified in her own behalf and denied injuring her baby or knowing how he was injured (Tr. IV 112-113).  She repeated her story about the older brother falling on the baby when she was

changing his diaper on the floor and the possibility that the leg fractures could have been caused by the bouncy swing (Tr. IV 87-92, 103-104).   She strongly implied that her neighbor, Heather Hulsey, had the opportunity to injure the baby on December 3, 2011, when she briefly watched the baby while Petitioner and her boyfriend went to the grocery store (Tr. IV 105-113, 133).   Additional facts will be discussed as they become pertinent to the Respondent's argument.

## PROPOSITION

**THE DECISION OF THE OKLAHOMA COURT OF CRIMINAL APPEALS THAT PETITIONER WAS NOT DENIED EFFECTIVE ASSISTANCE OF TRIAL COUNSEL WAS NOT CONTRARY TO, OR AN UNREASONABLE APPLICATION OF, SUPREME COURT PRECEDENT AND PETITIONER FAILS TO REBUT THE OCCA'S FINDINGS OF FACT BY CLEAR AND CONVINCING EVIDENCE.**

(In response to Petitioner's Grounds 1-4)

Petitioner claims in her habeas ground 1, as she did in her Proposition I 1(a) & (b) on direct appeal, that she suffered ineffective assistance of counsel by trial counsel allegedly not adequately preparing her for trial.   Petitioner claims in her habeas ground 2, as she did in Proposition I (2) & (3) on direct appeal, that trial counsel was ineffective by failing to procure an expert witness to counter the State's experts on the cause of the victim's injuries. Part of this ground, however, is unexhausted as shown in subproposition (C) below. Petitioner claims in her habeas ground 3, as she did in Proposition I (4) & (6) on direct appeal, that trial counsel was ineffective by failing to provide evidence to rebut the State's evidence and show the victim's injuries were accidental.   Petitioner claims in her habeas

ground 4, as she did in Proposition I (5) on direct appeal, that trial counsel was ineffective by failing to object to allegedly irrelevant and inflammatory evidence regarding Petitioner's contentious divorce and her prescription drug abuse.  Because all four grounds raised by Petitioner in her habeas petition involve ineffective assistance of trial counsel, they will be addressed together in this Proposition.  Petitioner fails to show the OCCA's decision on direct appeal that trial counsel was not ineffective was contrary to, or an unreasonable application of, Supreme Court precedent.

The OCCA reviewed this claim of ineffective assistance of counsel on direct appeal and found trial counsel was not ineffective. The OCCA issued a detailed rejection of the claim and specifically relied on *Strickland v. Washington*, 466 U.S. 668, 686 (1984), in doing so (Exhibit 3, pp. 1-6).  To prevail on a claim of ineffective assistance in the first instance, a defendant must prove that counsel's performance fell below an objective standard of reasonableness, and that counsel's deficiencies prejudiced his defense. *Strickland*, 466 U.S. at 687-688.  The defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694.  The reviewing court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* at 690.  There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at  689.  To show trial counsel was constitutionally ineffective on habeas review, Petitioner must show that counsel's performance was

"completely unreasonable" rather than "merely wrong." *Hoxsie v. Kerby*, 108 F.3d 1239, 1246 (10th Cir. 1997).

> It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable. If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings.

*Richter*, 562 U.S. at 102 (internal citations omitted).

State court decisions which are not "contrary to" clearly established Supreme Court law can be subjected to federal habeas relief only if they are not merely erroneous, but "an unreasonable application" of clearly established federal law, or based on "an unreasonable determination of the facts." *Early*, 537 U.S. at 11. The Supreme Court has held that state court decisions concerning ineffective assistance of counsel claims are owed "doubly deferential judicial review" under *Strickland* and § 2254(d)(1). *Richter*, 562 U.S. at 105; *Knowles*, 556 U.S. at 123.

The *Strickland* standard was designed to be difficult to meet, even under *de novo* review. It is doubly so under federal habeas review:

> [E]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) **is all the more difficult**. The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is **any**

15

> **reasonable argument that counsel satisfied** *Strickland's*
> deferential standard.

*Richter*, 562 U.S. at 105 (internal citations and quotation marks omitted) (emphasis added).

Thus, this Court must "determine what arguments or theories supported or. . .could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of th[e Supreme] Court." *Richter*, 562 U.S. at 102.  The purpose of section 2254(d) is to preserve the authority of federal courts to issue a writ of habeas corpus only in cases in which there is no possibility that fairminded jurists could disagree that the state court's decision conflicts with the Supreme Court's precedents.  *Id.* at 102. That is an exceedingly tough standard set by the Supreme Court for federal habeas review; one Petitioner fails to meet.   Accordingly, in this case, the Oklahoma Court of Criminal Appeals' decision must be given "double" deference.  Petitioner has presented nothing to overcome that deference on habeas review.  Accordingly, Petitioner fails to meet her burden under *Strickland*.

### A.    Failing to prepare Petitioner for trial.

Petitioner claims in her habeas ground 1, as she did in her Proposition I 1(a) & (b) on direct appeal, that she suffered ineffective assistance of counsel by trial counsel allegedly not adequately preparing her for trial.   Petitioner claimed on direct appeal that purported text messages between Petitioner and trial counsel attached with her Application for Evidentiary Hearing under Rule 3.11, *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch.18,

App. (2014), shows that trial counsel did not adequately meet with Petitioner and prepare her for trial (Exhibit 4).  The OCCA specifically rejected the claim on direct appeal finding the record did not support her claim (Exhibit 3, p. 3-4).  The OCCA held:

> We find in Proposition I that trial counsel was not ineffective.  Hammers must show that counsel's performance was deficient, and that the deficient performance was prejudicial. *Miller v[.] State*, 2013 OK CR 11, ¶ 145, 313 P.3d 934, 982; *Wiggins v. Smith*, 539 U.S. 510, 521, 123 S. Ct. 2527, 2535, 156 L. Ed. 2d 471 (2003); *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984). Counsel's acts or omissions must have been so serious that Hammers was deprived of a fair trial with reliable results. *Harrington v. Richter*, 562 U.S. 86, 104, 131 S. Ct. 770, 787-88, 178 L. Ed. 2d 624 (2011).  Trial counsel's performance is measured by an objective standard of reasonableness under prevailing professional norms.  *Coddington v. State*, 2011 OK CR 17, ¶ 78, 254 P.3d 684, 713-14; *Rompilla v. Beard*, 545 U.S. 74, 380, 125 S.Ct. 2456, 2462, 162 L.Ed.2d 360 (2005). Hammers must demonstrate a reasonable probability that, absent counsel's deficient performance, the outcome of the trial would have been different. *Miller*, 2013 OK CR 11, ¶ 145, 313 P.3d at 982.  A reasonable probability is one sufficient to undermine confidence in the outcome.  *Fisher v. State*, 2009 OK CR 12, ¶ 7, 206 P.3d 607, 609.  We give great deference to counsel's decisions, considering them according to counsel's perspective at the time. *Rompilla*, 545 U.S. at 380-81, 125 S. Ct. at 2462; *Wiggins*, 539 U.S. at 523, 123 S.Ct. at 2536. We presume counsel's conduct is professional, and her actions may be considered the product of a reasonable trial strategy. *Coddington*, 2011 OK CR 17, ¶ 78, 254 P.3d at 713-14. Hammers must show she was prejudiced by counsel's acts or omissions.  *Williams v. Taylor*, 529 U.S. 362, 394, 120 S. Ct. 1495, 1513-14, 146 L. Ed. 2d 389 (2000); *Strickland*, 466 U.S. at 693, 104 S. Ct. at 2067.  Where a defendant fails to show prejudice, we will dispose of a claim of ineffective assistance on that ground.  *Marshall v. State*, 2010 OK CR 8, ¶ 61, 232 P.3d 467, 481.

In connection with this proposition, Hammers filed a Rule 3.11 Motion for Evidentiary Hearing. There is a strong presumption of regularity in trial proceedings and counsel's conduct, and Hammers' application and affidavits must contain sufficient information to show by clear and convincing evidence the strong possibility that trial counsel was ineffective for failing to identify or use the evidence at issue. Rule 3.1 l(B)(3)(b)(I), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch.18, App. (2013). In deciding whether she meets this test, we must "thoroughly review and consider Appellant's application and affidavits along with other attached non-record evidence." *Simpson v. State*, 2010 OK CR 6, ¶ 53, 230 P.3d 888, 905. The Rule 3.11 standard set out above is easier for a defendant to meet than the Strickland standard, as a defendant must only provide clear and convincing evidence that there is a strong possibility counsel was ineffective. *Id*. at ¶ 53, 230 P.3d at 905-06. A Rule 3.11 motion must be accompanied by affidavits supporting the allegation of ineffective assistance of counsel. *Simpson*, 2010 OK CR 6, ¶ 53, 230 P.3d at 905.

Throughout her appellate brief, Hammers relies on her Rule 3.11 Motion to support the claims of error raised in her appellate brief. She offers four affidavits, and a number of unsworn (and, in some cases, unidentified) documents. We do not consider the latter for purposes of the Rule 3.11 Motion, and we do not consider the properly submitted affidavits, which are extra-record, to support the propositions of error raised in Hammers' appellate brief.

Hammers raises seven subpropositions in which she alleges trial counsel was ineffective. She first argues that trial counsel prevented her from making intelligent and knowing decisions regarding her case and counsel's representation. A lawyer should advise, inform and consult with her client, allowing the client to be involved in the decision process for the case. *Smith v. State*, 2006 OK CR 38, ¶ 40, 144 P.3d 159, 168. **Hammers claims that counsel, who entered an appearance in the case a year and a half before trial, failed to communicate with her and failed to prepare her for trial. The record does not support this claim. Hammers does not show what testimony she would have given, or how her**

18

> **testimony would have been different if she had the victim's medical records, and had counsel differently prepared her for trial**. *Jones v. State*, 2006 OK CR 5, ¶ 85, 128 P.3d 521, 547.

(Exhibit 3, pp. 1-4) (emphasis added).

The OCCA's determination of the facts, including that Petitioner's claim that trial counsel did not prepare her for trial is not supported by the record, is entitled to a presumption of correctness under 28 U.S.C. § 2254(e)(1) (Exhibit 3, p. 8); *See Hooks v. Workman*, 689 F.3d 1148, 1164 (10th Cir. 2012). Petitioner has presented nothing with her habeas petition to overcome that presumption of correctness. Accordingly, Petitioner has not met the "daunting standard" for showing the OCCA's decision was based on an unreasonable determination of the facts in light of the existing record regarding trial counsel's preparation of Petitioner for trial. *Byrd*, 645 F.3d at 1172 (internal citations and quotations omitted).

Moreover, the OCCA's denial of the claim under Rule 3.11 is a denial on the merits. The OCCA held in *Simpson v. State*, 230 P.3d 888, 905-906 (Okla. Crim. App. 2010), that when it denies a request for evidentiary hearing on a claim of ineffective assistance of counsel under Rule 3.11, "we necessarily make the adjudication that Appellant has not shown defense counsel to be ineffective under the more rigorous federal standard set forth in *Strickland*." The OCCA found that its denial of a Rule 3.11 motion is a ruling on the merits of the underlying *Strickland* claim:

> As [Rule 3.11] specifically allow[s] Appellant to predicate his claim on allegations "arising from the record or outside the record or a combination of both." *Id.*, it is, of course, incumbent upon this Court to throughly review and consider Appellant's

application and affidavits along with other attached non-record evidence to determine the **merits** of Appellant's ineffective assistance of counsel claim.

*Simpson,* 230 P.3d at 905-906 (emphasis added).

The OCCA reaffirmed the *Simpson* holding in *Grissom v. State*, 253 P.3d 969, 995 (Okla. Crim. App. 2011). The Tenth Circuit recognized in *Lott v. Trammell*, 705 F.3d 1167, 1213 (10th Cir. 2013), that based on the OCCA's interpretation of Rule 3.11 in *Simpson*, the OCCA's ruling on a Rule 3.11 motion is a ruling on the merits of an ineffective assistance claim and complies with the *Strickland* standard of review. *See also Wilson v. Trammell*, 706 F.3d 1286, 1305 (10th Cir. 2013) (same). As such, a denial by the OCCA of the Petitioner's ineffective assistance of counsel claim, including her Rule 3.11 Motion and attachments, is a ruling on the merits applying the *Strickland* standard. Petitioner has cited no on point Supreme Court precedent, other than *Strickland*, to show counsel was ineffective to support her claim. As such, this Court must apply the more general standard of *Strickland*. *Blake v. Janecka*, No. 14-2053, 624 Fed. Appx. 640, 646 (10th Cir. Aug. 25, 2015) (unpublished)[5] (holding if the only clearly established federal law Petitioner cites is *Strickland* itself, then *Strickland's* more general standard is used). Petitioner provides nothing to show the ruling of the OCCA was contrary to, or an unreasonable application of, *Strickland.*

The ruling of the OCCA is supported by the record. Petitioner attached a letter to her Rule 3.11 Motion purported to be signed by her that outlined the alleged lack of

---

[5]Unpublished decision cited for persuasive value only, pursuant to Fed. R. App. 32.1 and 10th Cir. R. 32.1(A).

communication with trial counsel.  However, there was no affidavit provided from Petitioner as required by Rule 3.11.  Furthermore, even if the letter from Petitioner was accepted as an affidavit, she failed to show how the alleged difficulties in communicating with her trial counsel, Ms. Gish, or alleged lack of preparation by her trial counsel prejudiced her trial. Petitioner fails to show any information that should have been provided in her testimony at trial that was not.  *See Doyle v. Jones,* No. 11-5052, 452 Fed. Appx. 836, 840 (10th Cir. Dec. 19, 2011) (unpublished)[6] (holding defendant failed to show ineffective assistance of counsel by trial counsel not consulting with him where Petitioner failed to show how consultation would have affected his defense); *Jones v. State,* 128 P.3d 521, 547 (Okla. Crim. App. 2006) (defendant failed to show any specific information he wished to testify about in claim that trial counsel was ineffective by advising him not to testify).

Nor does Petitioner show how the alleged lack of review of the baby's medical records with Petitioner by her trial counsel prevented her from testifying accurately about the factual events leading up to her taking the baby to the emergency room on December 8, 2011.  The medical records would not have aided Petitioner in remembering factual events that could have led to the baby's injuries or recalling the factual events or time line that precipitated her decision to take the baby to the emergency room.  Petitioner also failed to provide any evidence with her 3.11 Motion to support her claim that trial counsel directed

_____

[6]Unpublished decision cited for persuasive value only, pursuant to Fed. R. App. 32.1 and 10th Cir. R. 32.1(A).

21

her to abandon her defense of accident or directed her to attempt to blame the injuries on her neighbor, Ms. Hulsey.

A hearing was held by the trial court three days before trial on February 21, 2014. Petitioner was there along with trial counsel. Attorney Kent Bridge was at the hearing but made it clear he was not representing Petitioner. Mr Bridge said he was inquiring about getting on the case if it could be continued. He did not, however, ask for a continuance (Tr. Feb. 21, 2014, pp. 3-7). Petitioner was at the hearing but did not raise any concern about a lack of communication or preparation with trial counsel. The prosecutor noted Petitioner had already gone through three different lawyers counting Ms. Gish  (Tr. Feb. 21, 2014, p. 8). The case had already been pending for over two years (O.R. 1). The trial court noted the case was the oldest one on its docket and had been set for trial six times (Tr. Feb. 21, 2014, p. 9).

Before Petitioner testified at trial, the trial court advised Petitioner of her absolute constitutional right to testify or not to testify and that it was her decision alone to make. Petitioner was told by the court:

> Regardless of your attorney's advice, if she advises you to testify, you can still choose not to. If she advises you not to testify, you can still testify if you want. So I want the record to be clear. Is the decision to testify your personal, free, and voluntary decision?

(Tr. IV 5-6). Petitioner replied, "I want to testify." (Tr. IV 6). Petitioner did not express any concern about testifying or not being prepared to testify.

22

Petitioner repeated her story at trial about the older brother falling on the baby while she was changing his diaper and her testimony that she thought the leg fractures could have been caused by the bouncy swing (Tr. IV 87-92, 103-104).  That had been her repeated story all along that the baby's injuries to his eye could have been caused by the baby's older brother falling on him when she was changing the baby's diaper in the floor (Tr. II 76-80, 102-105, 137, 211-212, 216-217).  Contrary to Petitioner's claim, she did not change that story at trial and would have been subject to damaging cross-examination if she had attempted to change the story based on the number of times and people she told the story to before trial.

Petitioner did strongly imply for the first time at trial that her neighbor, Ms. Hulsey, had the opportunity to injure the baby on December 3, 2011, when she briefly watched the baby while Petitioner and her boyfriend went to the grocery store, as well as on earlier occasions when she said Ms. Hulsey watched the baby for her (Tr. IV 105-113, 131-133). That story was in response to the medical evidence, as outlined in the Statement of Facts, *supra*, that the injuries could not have occurred in the manner described by Petitioner.  There is nothing in the record to show Petitioner was prompted by trial counsel to attempt to blame the injuries on Ms. Hulsey.  Trial counsel was directing Petitioner along the lines of her consistent story all along that she was the primary care taker for the baby, and the baby's injuries were accidental.  Trial counsel asked Petitioner:

Q.     Are you the only one that took care of [M.B.]?

A.     No.

23

Q.      But is it safe to say that 99 percent of the time, it was you?

A.      No, it wasn't.

Q.      Okay, well, tell us.

(Tr. IV 105).

Petitioner then launched into her thinly veiled accusation that Ms. Hulsey was responsible for the baby's injuries (Tr. IV 105-107, 131-133). There is no indication that trial counsel directed Petitioner to go down that path. The problem with Petitioner's theory that her neighbor caused the injuries was that some of the baby's subdural hematomas were acute, meaning they occurred within 24 to 48 hours of the baby being brought to the emergency room at Children's Hospital on December 8, 2011 (Tr. II 154-156). There was no evidence that the baby was cared for by anyone other than Petitioner or her sister in the 24 to 48 hours before the baby was brought to the emergency room (Tr. IV 126-127).

The record does not support Petitioner's self-serving post-trial letter submitted with her 3.11 Motion claiming that she had difficulty communicating with Ms. Gish and that Ms. Gish did not go over all the baby's medical records with her or adequately prepare her to testify. Nowhere in the letter does Petitioner claim Ms. Gish directed her to abandon her claim of accident at trial. Prior to trial, Petitioner raised no complaints to the trial court about Ms. Gish's representation or preparation for trial, and Petitioner did not fire her or hire a different attorney. Petitioner did not provide an affidavit from Ms. Gish with her 3.11 Motion claiming she did not have adequate time with Petitioner to prepare her for trial or that Ms. Gish directed her to abandon her defense of accident.

24

Finally, Petitioner fails to show specifically how she was prejudiced by any limitations on the amount of time she spoke with Ms. Gish or how additional preparation would have changed her trial testimony.  *See Cummings v. Sirmons,* 506 F.3d 1211, 1227-1228 (10th Cir. 2007) (defendant failed to show ineffective assistance of counsel where he failed to show what additional preparation trial counsel could have engaged in); *Nguyen v. State*, 844 P.2d 176, 179-180 (Okla. Crim. App. 1992) (while different trial counsel might have spent more time preparing the case, defendant fails to show prejudice by alleged inadequate trial preparation).  Petitioner fails to show how additional trial preparation with her trial counsel or reviewing the baby's medical records with counsel would have changed the result of her trial.  As such, she fails to show how she was prejudiced by trial counsel's performance.  Accordingly, Petitioner fails to show the ruling of the OCCA was contrary to, or an unreasonable application of, *Strickland* or an unreasonable determination of the facts.

> **B.**     **Failing to procure an expert witness and failing to present evidence of accident.**
>
> (In response to Petitioner's habeas grounds 2 & 3.)

Petitioner claims in her habeas ground 2, as she did in Proposition I (2) & (3) on direct appeal, that trial counsel was ineffective by failing to procure an expert witness to counter the State's experts on the cause of the victim's injuries.  Petitioner claimed on direct appeal that trial counsel was ineffective for not obtaining expert witnesses to counter the testimony of the State's experts about shaken baby syndrome (SBS) and to show the injuries could have been caused by means other than shaking and by failing to present evidence to rebut the

opinions of the State's experts regarding SBS. Petitioner claims in her habeas ground 3, as she did in Propositions I (4) & (6) on direct appeal, that trial counsel was ineffective by not calling Dr. Buffington and other witnesses to support her defense of accident. Because the OCCA addressed these claims together on direct appeal, they will be addressed together in this proposition (Exhibit 3, pp. 1-6).

Petitioner attached medical articles with her Application for Evidentiary Hearing under Rule 3.11, *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch.18, App. (2014), in an attempt to rebut the State's theory of how the victim's injuries occurred. She did not provide any affidavits from experts showing an alternative cause for the victim's injuries, such as accident, or rebutting the testimony of the State's experts that the injuries suffered by the baby were not accidental (Exhibit 4).

In her direct appeal, Petitioner claimed that the amount of force required to cause SBS would "invariably cause neck trauma" and claimed the lack of evidence of a neck injury to the victim in this case undermined the State's experts reliance on SBS (Exhibit 1, pp. 8-9). Petitioner also claimed on direct appeal that trial counsel was ineffective by failing to rebut the State's evidence by not presenting experts to show the victim's injuries could have been caused by something other than shaking the baby.[7] Petitioner claimed on direct appeal that trial counsel failed to procure an expert to show the lack of neck injuries by the victim

---

[7]In her habeas petition ground 2, Petitioner raises for the first time several new claims of ineffective assistance of trial counsel regarding SBS that were not raised on direct appeal. As explained further below in subproposition (C), those claims are unexhausted but are subject to an anticipatory procedural bar if Petitioner attempted to raise them now in state court.

undermined the State's theory of SBS.  She also claimed trial counsel should have procured

an expert to challenge the State's expert testimony that the victim's eye injuries were caused

by SBS.  She claimed, without support, that subdural hematomas caused by accident could

have caused an increase in pressure on the brain that, in turn, could have caused the eye

injuries.  Finally, she claimed trial counsel should have rebutted testimony that acute,

subacute and chronic subdural hematomas on the baby's brain showed the victim had been

repeatedly abused  (Exhibit 1, pp. 10-16).

The OCCA, after considering Petitioner's brief and 3.11 Motion, specifically rejected

these claims of ineffective assistance of trial counsel on direct appeal finding Petitioner failed

to show prejudice by the lack of defense experts (Exhibit 3, p. 4).  The OCCA held:

> In three subpropositions, Hammers claims counsel should
> have explored or presented different evidence, including expert
> evidence contradicting the State's experts.  This Court will not
> relitigate the case on appeal.  **Hammers offers no affidavits
> from experts suggesting that, in this case, medical evidence
> would have supported another cause for the victim's
> injuries**. *Simpson*, 2010 OK CR 6, ¶ 53, 230 P.3d at 905;
> *Stemple v. State*, 2000 OK CR 4, ¶ 61, 994 P.2d 61, 73
> (defendant must show what expert testimony would have been).
> She completely fails to show how expert testimony, or different
> preparation or evidence presented by counsel, might have made
> a difference in this case.  The mere fact that experts might
> disagree over the general parameters of Shaken Baby Syndrome
> does not make opposing expert testimony relevant in this case.
> Every prosecution expert does not require an equal and opposite
> expert from the defense. *Richter*, 562 U.S. at 111, 131 S. Ct. at
> 791.

(Exhibit 3, p. 4) (emphasis added).

The ruling of the OCCA is supported by the record.  Petitioner failed to provide a single affidavit from an expert witness with her 3.11 Motion showing the medical evidence supported her theory of accidental injury or that the State's experts were wrong.  Petitioner presented nothing but hearsay with her 3.11 Motion in the form of medical articles referenced by appellate counsel in her brief and in appellate counsel's affidavit attached to her 3.11 Motion.  Petitioner provided no affidavit from an expert to show how the theories she posited applied to the evidence in this case. *See Petsche v. Tafoya*, No. 03-2275, 146 Fed. Appx. 306, 311 (10th Cir. Aug. 29, 2005) (unpublished)[8] (petitioner failed to show ineffective assistance of counsel where he failed to present affidavits from witnesses to show they likely would have furnished trial counsel with useful information).

Petitioner claims there are medical explanations for the subdural hematomas and retinal hemorrhages suffered by the baby other than the baby being shaken violently.  Among those causes, she says the head and eye injuries could have been caused by the older brother falling on the baby, as she testified, and that the leg fractures could have been caused by rough play by the brother or neighbor's children with the baby in the bouncy swing. However, Petitioner failed to provide with her 3.11 Motion an affidavit from a single medical expert who had examined the baby's medical records claiming the head and eye injuries were caused by other than violent shaking in this case or that the fractures were not caused by forceful twisting. *See Simpson*, 230 P.3d at 905-906 (Rule 3.11 Motion must be accompanied

---

[8]Unpublished decision cited herein for persuasive value only, pursuant to Fed. R. App. P. 32.1 and 10th Cir. R. 32.1(A).

by affidavits supporting the allegations of ineffective assistance of counsel); *Grisby v. Blodgett*, 130 F.3d 365, 373 (9th Cir. 1997) ("Speculation about what an expert could have said is not enough to establish prejudice."). Petitioner referenced several articles with her 3.11 Motion in support of her theory but those are nothing but hearsay with no affidavit from an expert linking the theories in those articles to the injuries the baby suffered in this case. *See Cannon v. Mullin*, 383 F.3d 1152, 1165 (10th Cir. 2004) (petitioner failed to show ineffective assistance of counsel where he failed to show what helpful testimony would have been elicited from expert witnesses); *Stemple v. State*, 994 P.2d 61, 73 (Okla. Crim. App. 2000) (defendant failed to show what testimony expert would have provided if he testified).

The Supreme Court reiterated in *Richter* that there are "[c]ountless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Richter*, 562 U.S. at 106 (quoting *Strickland*, 466 U.S. at 689). "Rare are the situations in which the 'wide latitude counsel must have in making tactical decisions' will be limited to any one technique or approach." *Id.* at 106 (internal citations omitted). Petitioner's claim on appeal, and in her habeas petition — that the injuries were accidental and the State's experts were wrong — is the very kind of after the fact strategy shopping the Supreme Court condemned in *Richter*.

In *Richter*, the Supreme Court found that trial counsel was not ineffective for failing to consult with forensic blood experts or introducing expert testimony to counter the State's evidence. "Counsel was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." *Richter*, 562

29

U.S. at 107 (internal citations omitted).  "Reliance on the 'harsh light of hindsight' to cast doubt on a trial that took place more than 15 years ago is precisely what *Strickland* and AEDPA seek to prevent." *Id.* at 107 (internal citations omitted).  The Supreme Court rejected a claim by Richter, almost identical to Petitioner's claim in the present case, that his trial counsel was ineffective by not hiring an expert to rebut the State's evidence.  "But *Strickland* does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense." *Richter*, 562 U.S. at 111.

So too in the present case "Newton's third law for the presentation of evidence" was not in effect.  Trial counsel was not required to go all over the country searching for shaken baby skeptics as defense experts.  The Supreme Court has made it abundantly clear that hindsight is not the standard by which to measure ineffective assistance of counsel claims. *Richter*, 562 U.S. at 107.  Because trial counsel elected to go with a different strategy in this trial by relying on the testimony of Petitioner and other witnesses that the injuries were caused by the older brother falling on the baby or by rough play in his bouncy swing, Petitioner fails to show trial counsel was ineffective by not calling expert witnesses. Petitioner failed to provide an affidavit from an expert witness on appeal in her Rule 3.11 Motion showing any testimony that would have changed the result of her trial.  Furthermore, Petitioner fails to show any viable line of cross-examination for the State's experts, backed by an affidavit from her own expert, that would have impeached their medical conclusions about the baby's injuries not being accidental.

Petitioner claims in her habeas ground 3 that trial counsel was ineffective for not calling Dr. Buffington to testify that she was a good mother who did not abuse her child and that she was not abusing her prescription pain medications.  Dr. Buffington's opinion that Petitioner was a good mother would have been at most cumulative to the testimony of the defendant's sister, boy friend, mother and father who all testified she was a good mother, that they had never seen her abuse her children and they did not believe that she would (Tr. III 175-196, 220-242, 277-287, Tr. IV 9-36).

Furthermore, if Dr. Buffington had testified about the narcotic pain medication he was prescribing Petitioner his credibility would have been impeached by the evidence of the over 1,000 narcotic pain pills and sleeping pills he prescribed to Petitioner over a three month period from August 30 to December 9, 2011, which overlapped the time when the baby was abused in this case (Tr. IV 116, State's Exhibit 4).

In addition, Dr. Buffington's credibility would have been further impeached by the testimony of Petitioner's own father who testified that he thought she was taking too much narcotic pain medication. "I didn't know exactly how much.  I knew it was too much."  He went on to say, "The big problem was the fact that doctors weren't treating what was really wrong with her.  They were just masking with medication." (Tr. IV 29).

Petitioner herself testified that she had been over-prescribed narcotic pain drugs by Dr. Buffington, and she felt better since she had stopped taking them (Tr. IV 116, 120).  She admitted she took all the pills that were prescribed (Tr. IV 85).  Dr. Buffington's credibility was further impeached by Petitioner's admission that Dr. Buffington dismissed her as a

patient, and she thought it might have been because Dr. Buffington was afraid of being sued by her for malpractice for over-prescribing narcotic pain medication for her (Tr. IV 117). If Dr. Buffington had testified favorably for Petitioner, he would have been subject to impeachment by the fact Petitioner thought she had a civil cause of action against him for medical malpractice.

Under those circumstances, Petitioner no doubt would now be claiming trial counsel was ineffective if she had called Dr. Buffington at trial and opened the door to damaging cross-examination. It was reasonable trial strategy not to call Dr. Buffington. *Richter*, 562 U.S. at 106, 110.  Petitioner has failed to establish a substantial likelihood of a different result but for counsel not calling Dr. Buffington as a character witness. *Richter*, 562 U.S. at 112.

Accordingly,  Petitioner fails to show trial counsel's strategy was deficient or that calling Dr. Buffington or defense experts would have changed the result of the trial. *See Richter*, 562 U.S. at 110 ("[t]here is no expectation that competent counsel will be a flawless strategist or tactician. . ."). Accordingly, Petitioner fails to show how she was prejudiced by trial counsel's performance by not calling Dr. Buffington or expert witnesses.  Therefore, Petitioner fails to show the ruling of the OCCA was contrary to, or an unreasonable application of, *Strickland* or an unreasonable determination of the facts.

### C.    Procedural default of unexhausted ineffective assistance of counsel claims.

Petitioner raises claims in her habeas ground 2 that are unexhausted and subject to anticipatory procedural bar because she did not raise them on direct appeal to the OCCA. Petitioner is not raising ineffective assistance of appellate counsel as cause and prejudice to

overcome the procedural bar.  Those claims include: allegations that trial counsel was ineffective by not procuring an expert because the State's experts allegedly falsely testified to retinal hemorrhaging and subdural hematomas as evidence of SBS in the baby, therefore "two of the triad" necessary for SBS were missing; there was no evidence of retinal hemorrhaging; the two week interval before seeking medical attention for the baby affected the result of the medical examination; failure to show lack of accusation of child abuse by babysitter prior to emergency room visit which supported lack of abuse; failure to show probable cause affidavit supported defense theory that leg injuries were caused by the older children playing rough with the victim in the baby jumper; and, counsel could have retained an expert to purportedly show the State's experts described the exact injury that would have corroborated Petitioner's trial testimony (Petition, pp. 6-7).

None of those claims were raised on direct appeal.  It appeared to Respondent that Petitioner raised a claim in her habeas ground 2 that appellate counsel was ineffective by not properly presenting her Rule 3.11 Motion to the OCCA by not presenting affidavits from experts after review of the records to support her claims of ineffective assistance of trial counsel. Petitioner argued, "Rather than collecting multiple articles appellate counsel should have sought to procure affidavit [sic] of experts after review of medical and court records." (Petition, p. 6).  Petitioner went on to give a lengthy list of reasons that appeared to show why she believed appellate counsel was ineffective by not obtaining expert witnesses to show trial counsel was ineffective (Petition, pp. 6-7).

In response, Respondent filed a Motion to Dismiss for Failure to Exhaust the apparent claims of ineffective assistance of appellate counsel (Doc 8 & 9).  Petitioner responded by stating she was not raising a claim of ineffective assistance of appellate counsel as a separate and distinct ground for habeas corpus relief (Doc. 10).  This Court agreed with Petitioner in the Court's Report and Recommendation, finding Petitioner "has clearly stated that Ground Two does not contain a claim of ineffective assistance of appellate counsel." (Doc 11, p. 4). This Court went on to find that the list of alleged instances of ineffective assistance of counsel in Ground 2 was directed at trial counsel and not appellate counsel (Doc 11, p. 4). Respondent, taking Petitioner at her word that she was not raising a claim of ineffective assistance of appellate counsel, did not object to the Report and Recommendation and the district court adopted the Report and Recommendation (Doc. 12).

That brings us to the present posture where none of the above listed claims of ineffective assistance of trial counsel were raised in Petitioner's direct appeal and, as such, are unexhausted.  Petitioner is not raising a claim of ineffective assistance of appellate counsel, and therefore fails to show cause for why the claims were not raised in her direct appeal.  Accordingly, the claims are unexhausted because they were not presented to the OCCA on direct appeal, but Petitioner would be procedurally barred under Oklahoma law if she returned to State court to exhaust the claims because she could have raised them on direct appeal. *See Welch v. State*, 972 P.2d 26, 29 (Okla. Crim. App. 1998) (post-conviction claims of ineffective assistance of trial counsel are waived if the claims were or could have been raised on direct appeal).  In *Hain v. Gibson*, 287 F.3d 1224, 1246 (10th Cir. 2002), the

34

Tenth Circuit found that because Petitioner did not present his claim to the OCCA it was unexhausted and procedurally barred:

> Because the claim is unexhausted and would be procedurally barred under Oklahoma law if Hain now attempted to present it to the OCCA, *see* Okla. Stat. tit. 22, § 1086, we need not address it as no cause and prejudice has been alleged, and Hain cannot establish that a fundamental miscarriage of justice would occur if the claim is not addressed. *See Coleman*, 501 U.S. at 735 n.1, 111 S. Ct. 2546.

*Id*.

A state court's procedural bar of a claim which rests on state law, independent of the federal question and adequate to support the judgment, will prevent assertion of error in a federal habeas case unless there is a showing of cause and prejudice or a fundamental miscarriage of justice. *Walker v. Martin*, 562 U.S. 307, 316 (2011), citing *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). The first part of the *Coleman* analysis demands an examination into whether the state procedural default was based on an adequate ground. To satisfy this prerequisite, the rule must be applied evenhandedly. *Beard v. Kindler*, 558 U.S. 53, 59 (2009); *Maes v. Thomas*, 46 F.3d 979, 986 (10th Cir. 1995). The Tenth Circuit has repeatedly acknowledged Oklahoma's consistent application of the "waiver" rule in post-conviction proceedings for issues that could have been raised on direct appeal. *Smith v, Workman*, 550 F.3d 1258, 1274 (10th Cir. 2008); *Steele v. Young*, 11 F.3d 1518, 1522 (10th Cir. 1993) (holding that OCCA has clearly indicated that Okla. Stat. tit 22, § 1086, strictly

prohibits raising claims that could have been raised earlier).[9]  The OCCA has evenhandedly implemented the procedural bar to claims which could have been raised on direct appeal. *Logan*, 293 P.3d at 973 (citing Okla. Stat. tit. 22, § 1086).

The Tenth Circuit acknowledged in *English v. Cody*, 146 F.3d 1257, 1260 (10th Cir. 1998) Oklahoma's process for submission of evidentiary matters in post-conviction proceedings.  *Id.* at 1260.  *English* provided a new standard for reviewing ineffective assistance of counsel claims which were waived on direct appeal, to wit:

> *Kimmelman*, *Osborn* and *Brecheen* indicate that the Oklahoma bar will apply in those limited cases meeting the following two conditions: trial and appellate counsel differ; and the ineffectiveness claim can be resolved upon the trial record alone.  (emphasis added).[10]

*Id.* at 1264.  If the foregoing criteria are absent, then a claim will be barred only if the Oklahoma appellate remand procedure is adequate and implemented evenhandedly.  *Id*.  Trial counsel and appellate counsel were different in this case and the claim can be resolved on the trial record, including Petitioner's Rule 3.11 Motion.   The cause standard requires a petitioner to "show that some objective factor external to the defense impeded . . . efforts to comply with the state procedural rules." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Petitioner stated in her response to Respondent's Motion to Dismiss for Failure to Exhaust

---

[9] OCCA has routinely applied the waiver rule in post-conviction proceedings to issues which could have been raised on direct appeal but were omitted.  *See Slaughter v. State*, 969 P.2d 990, 993 (Okla. Crim. App. 1998).

[10]*Kimmelman v. Morrison*, 477 U.S. 365 (1986); *Brecheen v. Reynolds*, 41 F.3d 1343 (10th Cir. 1994); *Osborn v. Shillinger*, 861 F.2d 612 (10th Cir. 1988).

that she is not raising a separate claim of ineffective assistance of appellate counsel.  As such, the new claims of ineffective assistance of trial counsel raised in Petitioner's habeas ground 2 are defaulted. *See Walton v. Franklin*, Case No. 09-5119, 358 Fed. Appx. 38, 41 (10th Cir. Dec. 22, 2009) (unpublished)[11] (petitioner's habeas claims are procedurally barred where he alleges no cause and prejudice for his default).  As previously referenced, if Petitioner attempted to raise the new issues of ineffective assistance of trial counsel to the OCCA, they would be procedurally barred because she could have raised them on direct appeal. *Logan*, 293 P.3d at  973.

Furthermore, a fundamental miscarriage of justice will not result if the issues raised are not considered by this Court.  In *Coleman*, the Supreme Court held that, "a fundamental miscarriage of justice requires proof of actual innocence." *Coleman*, 501 U.S. at 748.  The claims of ineffective assistance of trial counsel asserted by Petitioner in habeas ground 2 are not issues which advance actual innocence but merely dispute the State's evidence at trial and challenge trial counsel's performance. *Schlup v. Delo*, 513 U.S. 298, 327-28 (1995) (Petitioner must show "actual innocence" to meet fundamental miscarriage of justice standard).  At most Petitioner makes a claim of legal innocence.

As such, Petitioner does not meet the actual innocence requirement to show a fundamental miscarriage of justice.  To invoke the "fundamental miscarriage of justice" exception, Petitioner must identify evidence that affirmatively demonstrates her innocence.

---

[11]Unpublished decision cited herein for persuasive value only, pursuant to Fed. R. App. P. 32.1 and 10th Cir. R. 32.1(A).

*Phillips v. Ferguson*, 182 F.3d 760, 774 (10th Cir. 1999). The Supreme Court has held the threshold for showing actual innocence is "extraordinarily high." *Herrera v. Collins*, 506 U.S. 390, 417 (1993). Actual innocence "means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623-24 (1998). A claim that a witness testified falsely against the defendant is not an "affirmative demonstration of innocence." *Stuart v. Ward*, Case No. 05-7114, 236 Fed. Appx. 344, 348 (10th Cir. May 25, 2007) (unpublished).[12] Thus, Petitioner in the present case fails to establish that the application of the procedural bar would result in a fundamental miscarriage of justice. Accordingly, this Court should apply the Oklahoma procedural bar to Petitioner's new claims of ineffective assistance of trial counsel raised in habeas ground 2.

Petitioner did not raise those claims on direct appeal, and fails to show cause and prejudice to overcome the bar. Therefore the claims are unexhausted but would be procedurally barred if she attempted to raise them in a post-conviction application. Accordingly the claims are barred, and Petitioner does not raise ineffective assistance of appellate counsel as her excuse for the procedural default of her claims. *Edwards v. Carpenter*, 529 U.S. 446, 451-52 (2000). As the Supreme Court stated in *Carpenter*:

> [I]neffective assistance adequate to establish cause for the procedural default of some other constitutional claim is itself an independent constitutional claim. And we held in *Carrier* that the principles of comity and federalism that underlie our longstanding exhaustion doctrine—then as now codified in the federal habeas statute, see 28 U.S.C. §§ 2254(b), (c)—require

---

[12]Unpublished decision cited herein for persuasive value only, pursuant to Fed. R. App. P. 31.1 and 10th Cir. R. 32.1(A).

> that constitutional claim, like others, to be first raised in state
> court. "[A] claim of ineffective assistance," we said, generally
> must "be presented to the state courts as an independent claim
> before it may be used to establish cause for a procedural
> default."

*Carpenter*, 529 U.S. at 451-452 (internal citation omitted);  *see Walton*, No. 09-5119, 358

Fed. Appx. at 40-41 (unpublished)[13] (Petitioner procedurally defaulted  claim of ineffective

assistance of trial counsel when he failed to raise it as a claim of ineffective assistance of

appellate counsel in his post-conviction proceedings);  *Screws v. Jones*, No. CIV-06-429-T,

2006 WL 2645135, *1 (W.D. Okla. Sept. 14, 2006) (unpublished)[14] (where there is no basis

for the petitioner to allege he adequately presented an independent claim of ineffective

assistance of appellate counsel to the state court, he cannot rely on the allegation of

ineffective assistance of appellate counsel to excuse his procedural default); *see* Okla. Stat.

tit. 22, § 1086  ("All grounds for relief available to an applicant .  .  . must be raised in his

original, supplemental or amended application. Any ground . . . waived in the proceeding that

resulted in the conviction . . . or in any other proceeding the applicant has taken to secure

relief may not be the basis for a subsequent application[.]").   Petitioner failed to raise

ineffective assistance of appellate counsel as cause to overcome the procedural bar.  Since

Petitioner has failed to show "cause," the issue of prejudice need not be addressed. *Steele*,

---

[13]Unpublished decision cited herein for persuasive value only, pursuant to Fed. R. App. P. 32.1 and 10th Cir. R. 32.1(A).

[14]Unpublished decision cited herein for persuasive value only, pursuant to Fed. R. App. P. 32.1 and 10th Cir. R. 32.1(A).

11 F.3d at 1522 n.7.   As such, her new claims of ineffective assistance of trial counsel raised in habeas ground 2 are barred.[15]   Therefore, Petitioner is not entitled to habeas relief.

**D.     Failing to object to alleged inflammatory evidence**.

Petitioner claims in her habeas ground 4, as she did in Proposition I (5) on direct appeal, that trial counsel was ineffective by failing to object to allegedly irrelevant and inflammatory evidence regarding Petitioner's contentious divorce and her prescription drug abuse.  The OCCA specifically rejected the claim on direct appeal finding the record did not support her claim (Exhibit 3, p. 5).  The OCCA held:

> Hammers claims that trial counsel should have objected to what she alleges was inadmissible evidence.  Hammers did not raise the admissibility of this evidence as a separate substantive proposition of error.  We will not determine, in this ineffective assistance claim, whether the evidence should have been admitted.  Our review is limited to whether counsel's acts or omissions so prejudiced Hammers that she was denied a fair trial.  Hammers argues only that admission of this evidence focused the State's case on Hammer's character rather than the charges against her.  **The record does not support this claim. She has not shown she was prejudiced by admission of the evidence.  Hammers also claims trial counsel should have called a particular witness.  The record shows that trial counsel knew of this witness and chose not to call him, and supports our conclusion that this was a reasonable strategic decision**.

(Exhibit 3, p. 5) (emphasis added).

The OCCA's determination of the facts, including that the record does not support her claim of ineffective assistance of counsel where trial counsel was aware of the witness and

---

[15]If this Court disagrees that the claims are procedurally barred, Respondent does not waive the requirement of exhaustion under 28 U.S.C. § 2254(B)(3).

chose not to call him as a strategic decision, is entitled to a presumption of correctness under 28 U.S.C. § 2254(e)(1) (Exhibit 3, p. 8); *Hooks*, 689 F.3d at 1164.  Petitioner has presented nothing with her habeas petition to overcome that presumption of correctness.  Accordingly, Petitioner has not met the "daunting standard" for showing the OCCA's decision was based on an unreasonable determination of the facts in light of the existing record regarding trial counsel not objecting to this evidence at trial and by not calling Dr. Buffington as a witness. *Byrd*, 645 F.3d at 1172.

The decision of the OCCA is supported by the record.   Petitioner claims that trial counsel was ineffective by not objecting to testimony about her contentious divorce and heavy prescription drug use of narcotic pain killers.   As shown below, the evidence was properly admitted, and Petitioner fails to show trial counsel was ineffective by not objecting to it.

The prosecutor asked Ms. Hulsey, Petitioner's neighbor, about Petitioner's divorce. The State filed a Motion in Limine prior to trial to exclude evidence of specific actions by Petitioner's husband, Matthew Bryant, and Petitioner's relationship with him (O.R. 127-129). At the start of the trial the prosecutor announced that the State was calling Mr. Bryant as a witness but had no intention of getting into the relationship between Petitioner and Mr. Bryant (Tr. I 7-8).  The State only brought up the nature of the divorce on re-direct after the defense asked Mr. Bryant if he called his lawyer when he went to the emergency room at Children's Hospital (Tr. II 46, 54-56).

During the testimony of Ms. Hulsey, the State asked her if she had the opportunity to witness the interaction between Petitioner and her boyfriend, Ben Hall.  Ms. Hulsey said she had, and the State asked her how they got along.  Ms. Hulsey replied, "Good for the most part." (Tr. III 60).  The State then asked her if there were other times that they did not get along.  Ms. Hulsey testified that Petitioner and Mr. Hall had gotten into an argument, and she could hear it through the apartment wall (Tr. III 60-61).

The State then asked Ms. Hulsey if Petitioner ever talked to her about her divorce.  Ms. Hulsey said she had and the State asked Ms. Hulsey how she would characterize the divorce.  Ms. Hulsey said it was "[a]n angry divorce." (Tr. III 61).  The State then elicited from Ms. Hulsey that Petitioner shared with her text messages and emails from Petitioner's husband "[t]hat were not very nice." (Tr. III 62).  Ms. Hulsey testified that the messages upset Petitioner and that it was stressful for Petitioner (Tr. III 62).

This was relevant evidence to show Petitioner's contentious divorce was upsetting her and causing stress in her life.  The evidence was relevant to show a reason for why Petitioner would abuse her six-month-old baby in frustration and stress over her divorce.  It was not other crimes evidence as Petitioner claimed on direct appeal.  Under Oklahoma law, "Acts do not automatically fall under the category of other crimes or bad acts simply because they are morally questionable." *Carter v. State*, 177 P.3d 572, 576 (Okla. Crim. App. 2008).  Petitioner's contentious divorce was not morally questionable, much less other crimes evidence under Oklahoma law, but it did help explain to the jury the stress she was under at

42

the time she abused her baby.  As such, it was properly admitted under Oklahoma law and trial counsel was not ineffective for not objecting to it at trial.

Likewise, the evidence of Petitioner's extensive use of prescription narcotic drugs was relevant to show the potential impact of the drug use on her judgement and show another potential reason why she physically abused her baby.  Trial counsel opened the door to evidence about Petitioner's drug use by cross-examining Ms. Hulsey about whether she had any reason not to trust Petitioner with Ms. Hulsey's children and whether Ms. Hulsey had ever seen Petitioner violent with her own children.  Ms. Hulsey answered she trusted Petitioner with her own children, and she had never seen Petitioner violent with Petitioner's children (Tr. III 64-65).

The State later introduced an extensive list of all the prescription pain medication Petitioner was taking, along with sleeping pills, during the time the baby was abused.  On August 30, 2011, Dr. Buffington wrote Petitioner a prescription for 150 oxycodone pills.  On September 24, 2011, another doctor wrote Petitioner a prescription for 20 more oxycodone pills.  On September 28, 2011, Dr. Buffington wrote Petitioner a prescription for 40 Endocet pills, 100 hydrocodone, 150 oxycodone and 30 Ambien pills.   Dr. Buffington wrote Petitioner another prescription on October 26, 2011, for 150 Endocet and 30 Ambien.  On November 23, 2011, he wrote Petitioner a prescription for another 150 Endocet.  On December 9, 2011, Dr. Buffington wrote Petitioner two prescriptions for 30 pills each of clonazepam (Tr. III 169-170; State's Exhibit 4).

43

Petitioner claims that trial counsel was ineffective when she did not object to the testimony about the prescription narcotic drugs Petitioner was taking and the prosecutor's argument that Petitioner was addicted to prescription narcotic drug medication. Petitioner's heavy use of narcotic pain medications was relevant to show a reason why Petitioner abused her baby. The fact that she did not appear to the police detectives to be under the influence of drugs when she was interviewed the day after she brought her baby to the emergency room on December 8, 2011, does not mean she was not under the influence of narcotic pain medications when she violently shook her baby and twisted his legs and wrist to the point of breaking them on more than one occasion prior to that day (Tr. I 15, Tr. II 8). Any objection by trial counsel to admission of the drug use evidence would have been properly overruled under Oklahoma law. *See Randolph v. State*, 231 P.3d 672, 680 (Okla. Crim. App. 2010) (failure to object to admissible evidence is not ineffective assistance of counsel).

Petitioner herself testified that she had been over-prescribed narcotic pain drugs by her doctors, and she felt better since she had stopped taking them (Tr. IV 116, 120). She admitted she took all the pills that were prescribed (Tr. IV 85). Her father, who was a retired Oklahoma Bureau of Narcotics Agent, also testified that he thought she was taking too much narcotic pain medication. "I didn't know exactly how much. I knew it was too much." He went on to say, "The big problem was the fact that doctors weren't treating what was really wrong with her. They were just masking with medication." (Tr. IV 29).

Under those facts, as applied under Oklahoma law, it was a fair inference from the evidence that Petitioner was addicted to prescription narcotic pain drugs or at least was over

prescribed. *See Hogan v. State*, 139 P.3d 907, 936 (Okla. Crim. App. 2006) (prosecutor can discuss fair inference from the evidence).   There was nothing improper about the prosecutor's argument that Petitioner had a prescription drug problem (Tr. III 293, Tr. IV 120, 177).  As such, Petitioner fails to show she was prejudiced by trial counsel not objecting to the drug evidence or the prosecutor's fair comments based on the evidence.

Trial counsel did not object when the prosecutor cross-examined Petitioner about the reason Dr. Buffington dismissed her as a patient.  The prosecutor asked the Petitioner on cross-examination if Dr. Buffington dismissed her as a patient because of her prescription drug problem.  Petitioner admitted that Dr. Buffington dismissed her as a patient, but she denied it was for a drug problem.  She said it might have been because Dr. Buffington was afraid of being sued by her for malpractice for over-prescribing pain killers for her (Tr. IV 117).

There was nothing improper about the cross-examination. Petitioner presented nothing on direct appeal to show the prosecutor did not have a good faith basis for asking the defendant if she was dismissed by Dr. Buffington because of her prescription drug problem. Under Oklahoma law, the extent and scope of cross-examination is within the discretion of the trial court and may be extended beyond the scope of direct to impeach a witness. *Lacy v. State*, 171 P.3d 911, 914 n.3 (Okla. Crim. App. 2007); *Myers v. State*, 133 P.3d 312, 326 (Okla. Crim. App. 2006).   The cross-examination in this case was a proper attempt to impeach Petitioner's direct testimony that she was taking her prescription pain medications as directed by her doctor (Tr. IV 81-85). *See Randolph*, 231 P.3d at 680 (failure to object to

admissible evidence is not ineffective assistance of counsel). As such, the Petitioner fails to show how she was prejudiced by trial counsel not objecting to the cross-examination at trial.

Accordingly,  Petitioner fails to show trial counsel's strategy was deficient or that objecting to the alleged bad character evidence would have changed the result of the trial. *See Richter*, 562 U.S. at 110 ("[t]here is no expectation that competent counsel will be a flawless strategist or tactician. . ."). Therefore, Petitioner fails to show how she was prejudiced by trial counsel's performance by not objecting to the character evidence or objecting to the State's argument that Petitioner had a prescription drug problem.  Accordingly, Petitioner fails to show the ruling of the OCCA was contrary to, or an unreasonable application of, *Strickland* or an unreasonable determination of the facts.

### E.      Conclusion.

The OCCA found there was no merit to Petitioner's claims of ineffective assistance of counsel (Exhibit 3,  pp. 1-6).  "And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles,* 556 U.S at 123 (internal citations omitted); *Richter*, 562 U.S. at 105.

The record clearly establishes that defense counsel's performance satisfied the requirements of *Strickland*.  Petitioner presents nothing new in her habeas brief to meet her burden to show the OCCA's ruling was contrary to, or an unreasonable application of, *Strickland,* or an unreasonable determination of the facts.  A habeas petitioner's ineffective assistance claim must fail unless she can establish that fairminded jurists could not disagree that the arguments or theories that supported or "*could have supported*," the state court's

decision are inconsistent with Supreme Court precedents. *Richter*, 562 U.S. at 102 (emphasis added).

> As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement.

*Id.* at 103.  Petitioner fails to meet that high standard.

The Supreme Court recognized in *Strickland* the danger that "intrusive post-trial inquiry into attorney performance" could "encourage the proliferation of ineffectiveness challenges.  Criminal trials resolved unfavorably to the defendant would increasingly come to be followed by a second trial, this one of counsel's unsuccessful defense." *Strickland*, 466 U.S. at 690.

Since *Strickland* was decided there have, in fact, been a proliferation of ineffectiveness challenges.  In *Richter*, the Supreme Court has chosen to again emphasize that habeas review is not intended to "second guess" counsel's assistance after the trial:

> Surmounting *Strickland's* high bar is never an easy task. An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is all too tempting to second-guess counsel's assistance after conviction or adverse

47

> sentence. The question is **whether an attorney's representation amounted to incompetence** under prevailing professional norms, not whether it deviated from best practices or most common custom.

*Richter*, 562 U.S. at 105 (internal citations and quotation marks omitted) (emphasis added).

There is no evidence that trial counsel was "incompeten[t]" in the present case. *Richter*, 562 U.S. at 105. Petitioner has not shown that trial counsel's conduct in this case resulted in a trial that "cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686. Again, Petitioner fails to show that the results of the trial would have been different but for trial counsel's alleged errors. The OCCA found Petitioner failed to show how she was prejudiced by trial counsel's complained of strategies and omissions. More importantly, she fails to show the OCCA's adjudication of this claim was contrary to, or an unreasonable application of, *Strickland*.

Furthermore, "while in some instances even an isolated error can support an ineffective-assistance claim if it is sufficiently egregious and prejudicial, it is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy." *Richter*, 562 U.S. at 111 (internal citations and quotation marks omitted). Petitioner fails to show how she was prejudiced by trial counsel's performance. A petitioner's burden is a significant one to show ineffective assistance, as is evidenced in the *Strickland* Court's summation of the fundamental precept controlling in habeas matters:

> The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.

*Strickland*, 466 U.S. at 686.

Finally, with respect to the prejudice prong of *Strickland*, the High Court clarified in

*Richter*:

> In assessing prejudice under *Strickland*, *the question is not* whether a court can be certain counsel's performance had no effect on the outcome or *whether it is possible a reasonable doubt might have been established if counsel acted differently.* Instead, *Strickland* asks whether it is *reasonably likely* the result would have been different. *This does not require a showing that counsel's actions more likely than not altered the outcome, but the difference between Strickland's prejudice standard and a more-probable-than-not standard is slight and matters only in the rarest case. The likelihood of a different result must be substantial, not just conceivable.*

*Richter*, 562 U.S. at 111-112 (internal citations and quotation marks omitted) (emphasis

added). Petitioner in the present case fails to show a "'substantial' likelihood of a different"

result but for the alleged ineffective assistance of trial counsel in this case. *Pinholster*, 563

U.S. at 202 (citing *Richter,* 131 S. Ct. at 792).

Petitioner has failed to meet both the deficient performance and prejudice prongs of

the *Strickland* test on her complaints of ineffective assistance of counsel. Accordingly,

Petitioner has failed to show that the OCCA's opinion regarding ineffective assistance of trial

counsel was contrary to, or an unreasonable application of, *Strickland*, or an unreasonable

determination of the facts. Petitioner has to show more than the OCCA's opinion was wrong

but that it was objectively unreasonable. The OCCA's opinion was certainly not an

objectively unreasonable application of *Strickland*, especially when viewed through the prism

of "double deference." *Williams,* 529 U.S. at 409; *see also Richter*, 562 U.S. at 105 ("doubly"

deferential review of state court ruling on *Strickland* claim in habeas review); *Knowles*, 556

U.S. at 123 ("doubly deferential judicial review" applies to a *Strickland* claim on habeas).

Therefore, Petitioner is not entitled to habeas corpus relief.

## <u>CONCLUSION</u>

Petitioner's contentions have been answered by both argument and citations of

authority.  The Respondent contends that no error occurred which would require reversal or

modification, and, therefore, respectfully requests that Petitioner's request for federal habeas

relief be denied.

Respectfully submitted,

**E. SCOTT PRUITT**
**ATTORNEY GENERAL**


 **/s/Donald D. Self**
**DONALD D. SELF, OBA # 8062**
**ASSISTANT ATTORNEY GENERAL**

313 N.E. 21st Street
Oklahoma City, Oklahoma 73105
(405) 521-3921
(405) 522-4534 (FAX)
Service email:  fhc.docket@oag.ok.gov
**ATTORNEYS FOR RESPONDENT**

## CERTIFICATE OF SERVICE

    <u>X</u>    I hereby certify that on October 7, 2016, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing.

    <u>X</u>    I hereby certify that on October 7, 2016, I served the attached document by mail on the following, who is not a registered participant of the ECF System:

Megan Nicole Hammers, #693220
Mabel Bassett Correctional Center
29501 Kickapoo Rd.
McCloud, OK 74851

<u>s/ DONALD D. SELF</u>
